**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 9, 2015**

# In the Court of Appeals of Georgia

A15A0271. 2010-1 SFG VENTURE LLC et al. v. LEE BANK & TRUST COMPANY.

ELLINGTON, Presiding Judge.

Pursuant to a granted application for an interlocutory appeal, 2010-1 SFG Venture LLC and Milwaukee Hotel Owner LLC (collectively "Venture") contend that the Superior Court of Fulton County erred in denying their motion for summary judgment on Lee Bank & Trust Company's ("Lee Bank's") claims. For the following reasons, we reverse the court's order in part, vacate it in part, and remand with direction.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a [grant or] denial of summary judgment, and we view the evidence, and all reasonable

conclusions and inferences drawn from it, in the light most favorable to
the nonmovant.

(Citations and footnote omitted.) *GEICO Gen. Ins. Co. v. Wright*, 299 Ga. App. 280, 281 (682 SE2d 369) (2009). So viewed, the record shows the following.

This case arises out of a commercial real estate loan for approximately $15 million, which was originated by non-party Specialty Finance Group LLC ("SFG") in 2008 to DOC Milwaukee LP ("the borrower") to fund the construction of a hotel in Milwaukee, Wisconsin. The hotel was part of the collateral for the loan. After SFG originated the Loan, Lee Bank bought a 3.36% interest in the loan for $500,000, the sale of which was memorialized in a "Participation Agreement" signed by the president and CEO of Lee Bank.

Pursuant to the participation agreement, Lee Bank, in exchange for its purchased interest, was entitled to receive its pro rata share of the payments the borrower made on the loan. The agreement also obligated Lee Bank to pay its pro rata share of any losses and expenses sustained in connection with the loan. SFG, as the holder of the largest percentage interest in the Loan (about 47%) retained the "reasonable discretion" to make decisions concerning the administration of the loan. However, it also required SFG to "exercise the same degree of care in administering

2

the loan that SFG customarily exercises in administering similar loans for its own account." The agreement provided that Lee Bank purchased its interest "on a non-notification, all servicing rights retained by SFG basis." Although SFG agreed to make "reasonable efforts under the circumstances then applicable" to consult with Lee Bank concerning any actions taken with respect to the loan, the agreement provided that "in all events the decision of SFG shall control." Further, although the agreement provided that SFG would inform Lee Bank of any default by the borrower, SFG retained the right "to sell or otherwise dispose of the [hotel] without the prior approval of [Lee Bank] and the commercially reasonable decision of SFG shall be binding as to the best manner in which to proceed with respect to the completion or construction, operation, management and disposition of the [hotel]."

The agreement also contained specific provisions governing any breaches of the participation agreement by SFG or by Lee Bank. With respect to an alleged breach by SFG, the agreement provided that, "[i]f SFG shall fail to cure any material default by SFG under this agreement" within 30 days, Lee Bank would have, in addition to its rights at law and equity, a right to require SFG to repurchase its participation interest, less certain costs and subject to any regulatory limitations.

3

The agreement also limited SFG's liability for any action taken with respect to the loan or participation agreement as follows:

> **17. *Limitation on Liability of SFG.*** SFG shall not be liable for any action taken or omitted to be taken by it or by any of its employees, members, officers, managers, contractors or agents, or any of them, for any errors of judgment under, or in connection with this Agreement, or any of the Loan Documents, except in the case of gross negligence or willful misconduct.

The record shows that the borrower initially made regular payments on the loan, that SFG made regular remittances to Lee Bank of its 3.36% share of those loan payments, and that Lee Bank accepted and retained those remittances. The borrower, however, eventually defaulted on the loan by failing to make loan payments and by halting construction of the hotel. Shortly thereafter, the loan guarantors declared bankruptcy. In May 2009, SFG's parent company, Silverton Bank, was closed and, a year later, the FDIC was appointed receiver for Silverton and SFG. The FDIC sold SFG's loan portfolio, including SFG's interest in the instant loan, to an affiliate of Venture.

Following its purchase of the loan from the FDIC, Venture assumed SFG's role as lead lender under the purchase agreement. Venture took control of the hotel and,

over a three and a half year period, made repairs to it, paid insurance and real estate taxes, pursued legal action against the borrower, and negotiated settlements with contractors who had placed liens against the property. In its efforts to secure and to maintain the value of the hotel, Venture incurred over $6 million in expenses. Venture issued regular demands to the participant banks for their pro rata shares of these expenses. For example, in 2010 and 2011, it demanded of Lee Bank payments of $20,243.27, $9,070.27, $11,504.99, and $3,424.27.

By letter dated January 3, 2013, Lee Bank informed Venture that it believed that the expenses incurred in connection with the loan were grossly unreasonable. It considered Venture to be in breach of the participation agreement by failing to notify it of "material adverse information." Lee Bank demanded that "Venture acknowledge that the Participation Agreement[ has] been terminated and to restore [Lee Bank's] consideration by repurchasing [its] participation interest[] within thirty (30) days" of the date of the letter. Lee Bank also demanded that Venture remit to it its pro-rata share of any proceeds of the sale of any collateral "without offset or diminution." On January 31, 2013, Venture sued Lee Bank for breaching its obligation under the participation agreement. Lee answered, denying responsibility for the expenses, and brought counterclaims for breach of contract and rescission.

5

While the lawsuit was pending, Venture retained a commercial real estate firm to sell the renovated hotel. Venture's intention to sell the hotel was published to a website that it had created to keep participant banks informed of its loan management activities. The real estate agent procured six offers, the highest of which was for $12 million. The $12 million offer and the associated contract documents were shared with the participant banks; none of the banks objected to the sale price. The hotel was sold in October of 2013; thereafter, Venture distributed $141,163.94 to Lee Bank. According to Venture, this amount represented Lee Bank's share of the proceeds ($347,695.69) less that portion of expenses due Venture from Lee Bank ($206,531.75).

In early August 2013, an Atlanta-based consulting firm inspected the property at the request of counsel for Lee Bank, and it appraised the hotel in the condition it had been on May 12, 2012, before the renovation was complete. The firm opined that the appraised value of the hotel as of that date was $17.1 million.

On January 31, 2014, Venture moved for summary judgment on Lee Bank's counterclaims for breach of contract and for rescission arguing, inter alia, that Paragraph 17 of the participation agreement limited SFG's (and hence Venture's) liability only to those acts or omissions that amounted to gross negligence or willful

6

misconduct. The trial court denied the motion. In its order, the court determined that the limitation of liability provision in the participation agreement was unenforceable because the provision was not prominently displayed in the agreement. Additionally, with respect to Lee Bank's breach of contract claims, the trial court ruled that Lee Bank could pursue a breach of contract claim based on Venture's failure to repurchase Lee Bank's participation interest. And, with respect to Lee Bank's rescission claim, the trial court found that questions of fact remain as to whether Lee Bank's offer to restore the consideration it received under the agreement was reasonable under the circumstances. It is from these rulings that Venture appeals.

1. (a) Venture contends that the trial court erred in concluding that Paragraph 17 of the participation agreement, a clause that limited SFG's (and hence Venture's) liability to acts or omissions that amounted to gross negligence or willful misconduct, was unenforceable because it was not sufficiently prominent in the agreement. Our review of this claim of error is de novo.[1] For the following reasons, the limitation of

_____

[1] "[T]he construction of a contract is a matter of law, which is subject to de novo review." (Footnotes omitted.) *Richard Bowers & Co. v. Clairmont Place, LLC*, 324 Ga. App. 673, 676 (a) (751 SE2d 481) (2013).

liability clause[2] at issue was valid and enforceable and the trial court erred in concluding to the contrary.

> It is the paramount public policy of this state that courts will not lightly interfere with the freedom of parties to contract. A contracting party may waive or renounce that which the law has established in his or her favor, when it does not thereby injure others or affect the public interest. Exculpatory clauses in Georgia are valid and binding, and are not void as against public policy when a business relieves itself from its own negligence.

(Citation omitted.) *Neighborhood Assistance Corp. of America v. Dixon*, 265 Ga. App. 255, 256 (1) (593 SE2d 717) (2004).[3] Given this paramount public policy,

---

[2] Whether the clause at issue is characterized as a limitation-of-liability clause or an exculpatory clause is immaterial because "Georgia case law does not appear to treat such clauses differently for purposes of review." *Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 135 (2) n. 20 (746 SE2d 793) (2013) (physical precedent only as to Division 2).

[3] See also, *Lanier at McEver v. Planners & Engineers Collaborative*, 284 Ga. 204, 205 (1) (663 SE2d 240) (2008) ("As a general rule, a party may contract away liability to the other party for the consequences of his own negligence without contravening public policy, except when such an agreement is prohibited by statute.") (citation and punctuation omitted); *Piedmont Arbors Condominium Assn. v. BPI Constr. Co.*, 197 Ga. App. 141, 142 (397 SE2d 611) (1990) ("Absent a public policy interest, contracting parties are free to contract to waive numerous and substantial rights, including the right to seek recourse in the event of a breach by the other party.") (citations and punctuation omitted); compare *Peck v. Rollins Protective Services, Inc.*, 189 Ga. App. 381, 383 (2) (375 SE2d 494) (1988) (contract clause

8

courts "exercise extreme caution in declaring a contract void as against public policy, and should do so only when the case is free from doubt and an injury to the public interest clearly appears." *Piedmont Arbors Condominium Assn. v. BPI Constr. Co.*, 197 Ga. App. at 142.

In determining whether Paragraph 17 of the agreement is enforceable under Georgia law, we note that "because exculpatory clauses may amount to an accord and satisfaction of future claims and waive substantial rights, they require a meeting of the minds on the subject matter and must be explicit, prominent, clear and unambiguous." (Citation and punctuation omitted.) *Holmes v. Clear Channel Outdoor*, 284 Ga. App. 474, 477 (2) (644 SE2d 311) (2007). In this case, the trial court determined that the limitation of liability clause was not sufficiently prominent, focusing on the fact that the clause was "written in the same serif font [as the rest of the contract], with the same heading style, and there are no bolded or italicized words within [the clause.]"

In determining whether a limitation of liability clause or an exculpatory clause is sufficiently prominent, courts may consider a number of factors, including whether

---

limiting liability for negligent acts does not serve to limit liability for wilful and wanton conduct).

the clause is contained in a separate paragraph; whether the clause has a separate heading; and whether the clause is distinguished by features such as font size. See, e.g., *Parkside Center. v. Chicagoland Vending*, 250 Ga. App. 607, 611-612 (2) (522 SE2d 557) (2001) (clause held unenforceable because it was contained at the end of a paragraph, which did not have its own heading, but was one of many listed under the heading "Miscellaneous," and was printed in the same font size as the surrounding provisions); *Imaging Sys. Intl. v. Magnetic Resonance Plus*, 227 Ga. App. 641, 644-645 (1) (490 SE2d 124) (1997) (an exculpatory clause was held enforceable where it was contained in its own paragraph, with the capitalized heading "LIMITATION OF LIABILITY").

While font size is one of many important factors, it is not determinative of whether an exculpatory or limitation of liability clause is sufficiently prominent. For example, in *Grace v. Golden*, 206 Ga. App. 416, 417-418 (1) (b) (425 SE2d 363) (1992), an exculpatory clause was placed after the legal description in a security deed and was in the same typeface as the legal description. We held that the exculpatory clause was nevertheless prominent enough to be enforceable in light of the fact that the deed was only two pages long and the clause was located in a place where the party signing the document, who had a duty to review the document, would have seen

10

it. Under those circumstances, we concluded the drafters of the document had not intended to "camouflage" the provision so as to prevent it from being detected at closing. Id.

In this case, the limitation of liability clause was contained entirely within its own paragraph. It was announced, in bold font and underlined text, by a heading that clearly informed the reader of the clause's content: "***Limitation on Liability of SFG***." The clause was the seventeenth of thirty paragraphs in a twelve page document. The paragraph was part of a collection of like paragraphs pertaining to the rights, responsibilities, representations, and warranties of SFG and the participating banks. The limitation of liability clause was not hidden in the minutiae of unrelated provisions.

Moreover, the participation agreement itself reveals that Lee Bank had helped draft the agreement and, therefore, should have been aware of its contents. The parties averred in the participation agreement that the agreement was "negotiated by both parties with the representation and advice of their legal counsel." As a consequence, the parties agreed to waive the right to have the contract construed "against the draftsman of any provision" of the agreement. Additionally, the agreement was signed on behalf of Lee Bank by its president and CEO, a person with three decades

11

of experience in the banking industry and with "extensive experience in commercial lending, banking standards, and banking operations." The CEO gave an affidavit stating that he was familiar with loan participation agreements, that he understood their risks, and that he had read the contract. He even admitted that he was aware of the limitation of liability clause. This contract was a commercial contract between sophisticated business entities with equal bargaining power, not a consumer contract or a contract of adhesion. Thus, the limitation of liability provision, when viewed in this context, had all the hallmarks of "a reasonable allocation of risks in an arms-length business transaction." *RSN Properties, Inc. v. Engineering Consulting Servs., Ltd.*, 301 Ga. App. 52, 54-55 (686 SE2d 853) (2009) (holding that a limitation-of-liability clause in a contract for professional engineering services did not violate public policy).

Given these circumstances, we hold that the limitation of liability clause was sufficiently prominent and that Lee Bank has not demonstrated that declaring the clause unenforceable clearly serves the public interest. See, e.g., *RSN Properties, Inc. v. Engineering Consulting Servs., Ltd.*, 301 Ga. App. 52, 54-55; *Imaging Sys. Int'l v. Magnetic Resonance Plus*, 227 Ga. App. at 644-645 (1); *Grace v. Golden*, 206 Ga.

12

App. at 417-418 (1) (425 SE2d 363) (1992). Consequently, the trial court erred in ruling that the clause was unenforceable.

(b) Lee Bank argues that, in the event this Court finds the limitation of liability clause sufficiently prominent, as we have done, See Division 1 (a) supra, we should nevertheless affirm the trial court's ruling under the "right for any reason" rule because the limitation of liability clause is ambiguous as to whether it applies to breach of contract claims. Lee Bank has failed, however, to identify any such ambiguity.

The clause expressly limited SFG's liability for "any action taken or omitted to be taken . . . in connection with this Agreement, or any of the Loan Documents, except in the case of gross negligence or willful misconduct[.]"[4] "[A]ny action taken or omitted to be taken" is broad enough to include conduct which may give rise to either a tort or to a breach of contract. See *Imaging Sys. Intl. v. Magnetic Resonance Plus*, 227 Ga. App. at 644 (1) ("The meaning of 'any' in context is 'all.'").[5] Further,

---

[4] If the language of a contract is clear and unambiguous, we enforce the contract according to its terms. *Lostocco v. D'Eramo*, 238 Ga. App. 269, 275 (d) (518 SE2d 690) (1999).

[5] We note that the limitation of liability clause does not contain any "self-limiting" language; that is, it does not limit its application to conduct or actions performed "in accordance with" the terms of the participation agreement, but only "in

it is axiomatic that "a single act or course of conduct may constitute not only a breach of contract but an independent tort as well[.]" *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365 (203 SE2d 587) (1973). Thus, we hold that the limitation of liability clause specifically limited SFG's (and hence successor-in-interest Venture's) potential liability for breaches of the agreement to those breaches arising from a specific type of conduct – gross negligence or willful misconduct. See *Chemical Bank v. Security Pacific Nat. Bank*, 20 F3d 375, 378 (9th Cir. Cal. 1994) (A credit agreement that specifically limited the agent bank's potential liability for breaches of the agreement to "its own gross negligence or willful misconduct" was enforceable.); *Firstar Metropolitan Bank & Trust v. FDIC*, 964 FSupp. 1353, 1356-1357 (I) (D. Ariz. 1997) (A party to a contract can specifically limit its liability under a contract for claims sounding in breach of contract arising from its "own gross negligence or willful misconduct."); *Federated Project & Trade Fin. Core Fund v. Amerra Agri Fund, LP*, 2014 N.Y. Misc. LEXIS 1596 (No. 651986/12 N.Y. Sup. Ct. decided April.

_____

connection" with it. See *U.S. Bank Nat. Assn. v. Builders Bank*, (2011 U.S. Dist. LEXIS 31597) (No. 08C5648 N.D. Ill. decided March 25, 2011) (When a bank's unilateral decision to extend a loan's maturity date and reduce the interest rate violated the participation agreement, the provision limiting liability to acts of gross negligence or willful misconduct did not protect it from a breach of contract claim because the bank's actions were not "in accordance with" the participation agreement as specified in the limitation of liability clause.).

14

4, 2014) (The defendant was entitled to summary judgment on the plaintiffs' cause of action for breach of contract, given the existence of the limitation-of-liability clause and the fact that the defendant's conduct did not amount to gross negligence or wilful misconduct as a matter of law.). The cases cited by Lee Bank are distinguishable.[6]

(c) Lee Bank also argues that the limitation of liability clause conflicts with other provisions of the agreement defining what circumstances constitute a breach of the agreement and, because those provisions do not reference or specifically

---

[6] Lee Bank cites *Dept. of Transp. v. Arapaho Constr.*, 180 Ga. App. 341, 343 (1) (349 SE2d 196) (1986) and *C&S/Sovran Corp. v. First Fed. Sav. Bank*, 266 Ga. 104, 105 (1) (463 SE2d 892) (1995). In *Arapaho*, a contract termination provision (which was reviewed as an exculpatory clause) allowed the Department to terminate its contract, without penalty, under certain listed circumstances. The clause, however, did not explicitly mention whether the Department could terminate the contract when it was in breach of the contract. The claim at issue in *Arapaho* did not involve one of the circumstances specifically listed in the termination provision; accordingly, this Court concluded that the provision could not be construed as limiting the Department's liability for the breach at issue. See *Dept. of Transp. v. Arapaho Constr.*, 180 Ga. App. at 343-344 (1). In *C&S/Sovran Corp.*, a termination provision was likewise construed as an exculpatory clause. The Court concluded that, because the termination provision did not mention whether the drafter of the contract could terminate the contract when it was in breach of the contract, the drafter would not be permitted to invoke the provision in order to avoid all liability – and to avoid specific performance, as contemplated elsewhere in the agreement – in light of its breach. See *C&S/Sovran Corp. v. First Fed. Sav. Bank*, 266 Ga. at 106-107 (1). Neither of these cases is factually analogous to the instant case.

15

incorporate the limitation of liability, the limitation of liability clause should be stricken. We have found no Georgia law, nor has Lee Bank cited to any, that requires every contract provision that may be affected by a contract's limitation-of-liability clause or an exculpatory clause to reference the clause. Moreover, under Georgia law, "[a] contract must be construed so as to reconcile its different provisions and to reject a construction that leads to a contradiction." (Citation omitted.) *Anderson v. Anderson*, 274 Ga. 224, 228 (3) (552 SE2d 801) (2001).

In this case, although certain clauses of the participation agreement set forth circumstances which would constitute a breach of the participation agreement, they must be read in conjunction with the limitation of liability clause. When read in conjunction with the limitation-of-liability clause, it is apparent that a breach of the participation agreement does not result in liability – that is, it is not a *compensable* breach – unless it is the result of conduct that constitutes gross negligence or willful misconduct. Lee Bank has not demonstrated any alternate basis for holding the limitation of liability clause unenforceable.

2. (a) Given our holding that the limitation of liability clause is enforceable, see Division 1, supra, whether Lee Bank's counterclaims for breach of contract and

16

rescission[7] may proceed to a jury depend on whether the evidence is sufficient to create a jury question as to whether Venture's conduct (which forms the basis of the alleged material defaults or breaches of contract) rises to the level of willful misconduct or gross negligence under the circumstances presented here. For the following reasons, we vacate the court's order denying Venture's motion for summary judgment on Lee Bank's counterclaims for breach of contract and rescission and remand with direction.

"Gross negligence is defined as the failure to exercise that degree of care that every man of common sense, however inattentive he may be, exercises under the same or similar circumstances; or lack of the diligence that even careless men are accustomed to exercise. . . . Wilful misconduct is based on an actual intention to do harm or inflict injury." (Citations, footnote, and punctuation omitted.) *Currid v. DeKalb State Court Probation Dept.*, 274 Ga. App. 704, 707 (2) (618 SE2d 621) (2005). See also OCGA § 51-1-4 (defining "slight diligence" and "gross negligence"). "In other words, gross negligence has been defined as equivalent to the failure to

---

[7] Lee Bank averred that Venture had breached "Sections 4, 7, 9, 10, 15, and 26" of the participation agreement. It also averred that it had the right to rescind the participation agreement "[a]s a result of Venture's breaches" of "Sections 4, 7, 9, 10, 15, and 26" of the participation agreement and that Venture should be ordered to pay it $500,000 plus interest, attorneys' fees, and expenses.

17

exercise even a slight degree of care." (Citation and punctuation omitted.) *Heard v. City of Villa Rica*, 306 Ga. App. 291, 294 (1) (701 SE2d 915) (2010). "Questions of negligence and diligence, even of gross negligence and slight diligence, usually are matters to be determined by the jury, but in plain and indisputable cases the court may solve the question as a matter of law." (Citation and punctuation omitted.) Id. at 295 (1). See also *Morgan v. Horton*, 308 Ga. App. 192, 198 (3) (707 SE2d 144) (2011) (accord).

Lee Bank averred that Venture was in breach of the participation agreement based upon the following: (1) Venture failed to notify Lee Bank of materially adverse changes to the loan and the hotel; (2) failed to consult with Lee Bank concerning the management and disposition of the hotel; (3) failed to disburse certain funds to Lee Bank; and (4) failed to manage, repair, and sell the hotel in a commercially reasonable manner.

Specifically, with respect to Venture's management decisions, Lee Bank objects to Venture's decision to incur in excess of $6 million dollars in expenses on a $15 million dollar loan, its decision to settle with a title insurance company, its failure to obtain an appraisal of the hotel before selling it, and its decision to sell the hotel for less than what Lee Bank contended was its fair market value. Lee Bank

18

averred that these acts, under the circumstances, constituted "gross negligence and/or willful misconduct."

Given its ruling that the limitation-of-liability clause was unenforceable, the trial court did not address whether the evidence adduced presented a jury question as to whether Venture's conduct could be considered willful misconduct or gross negligence. And, because the record on this issue has yet to be fully developed, as explained in Division 2 (b) below, we remand the case to the trial court to consider whether such a jury question exists.

(b) Lee Bank argues that, although Venture's decisions may have been commercially reasonable for Venture in light of the fact it purchased SFG's interest in the loan at a considerable discount, its decisions with respect to the participant banks were grossly unreasonable and tantamount to willful misconduct:

> Had Venture treated this Loan as one made from its own money, Venture would have sought to maximize its return by selling the Property at or near its market value. However, because Venture's investment was discounted, Venture could sell the collateral for $5.1 million below market value and still make a profit, whereas the participants suffered huge losses.

Lee Bank moved the court for an order compelling Venture to produce financial documents which would reveal Venture's motivations for buying the loan from the FDIC, its discount on the loan, its rationale for making over $6 million in repairs to the hotel, and the reasoning behind selling the property at auction for $12 million. Given its ruling on the limitation of liability clause, the court denied the motion to compel, stating that whether Venture was motivated to make a quick return at Lee Bank's expense was irrelevant. However, given our ruling in Division 1, whether Venture was motivated to make a quick profit at the expense of the participant banks is relevant. Indeed, it is the crux of the matter. An understanding of Venture's investment position in the loan allows the factfinder to infer whether Venture was making decisions to maximize its own profit at the expense of the participating banks or whether it was exercising that same degree of care in administering the loan that SFG (and hence Venture) was required by the agreement to exercise, that is, the degree of care that it would use in administering similar loans for its own account. A complete understanding of what Venture had to gain or lose as a result of its management decisions concerning the hotel is relevant to a consideration of whether Venture's actions, vis à vis the participant banks, were commercially reasonable or grossly negligent. Consequently, we also vacate that

20

portion of the court's order denying Lee Bank's motion to compel and direct the court to reconsider the motion in light of this opinion.

3. Venture argues that it was also entitled to summary judgment on Lee Bank's rescission and breach of contract claims on alternate bases. For the following reasons, we find these arguments without merit.

(a) *Rescission*. Venture argues that Lee Bank failed to return the payments it received under the agreement; therefore, it argues, Lee Bank's claim for rescission must fail. The record shows, however, that Lee Bank offered to restore the consideration it received in its initial answer and counterclaims and repeated the offer in its amended pleadings. It also made the offer during oral argument on its motion for summary judgment.

A contract may be rescinded for substantial nonperformance or material breach. *Cutcliffe v. Chesnut*, 122 Ga. App. 195, 201 (2) (176 SE2d 607) (1970). OCGA § 13-4-62 provides that "[a] party may rescind a contract without the consent of the opposite party on the ground of nonperformance by that party but only when both parties can be restored to the condition in which they were before the contract was made." This means that "[t]he parties must be returned as nearly as possible to the status quo ante." (Citations omitted.) *Southern Prestige Homes v. Moscoso*, 243 Ga.

21

App. 412, 417 (4) (532 SE2d 122) (2000). It does not mean, however, that the law requires in all circumstances that the rescinding party return the consideration received under the contract as a condition precedent to pursuing a claim for rescission. The failure to offer restoration

> does not defeat [a] rescission claim as a matter of law. There are circumstances under which a party need not offer restoration in order to rescind a contract, such as where nothing of any value is received by the party seeking to rescind; and where the amount received under the contract sought to be rescinded may be less than the amount actually due the party seeking to rescind. Moreover, the rule that he who desires to rescind a contract must restore whatever he has received under it is one of justice and equity and must be reasonably construed and applied. The object of the rule is theoretically to place the parties in statu quo; but the rule is equitable, not technical, and does not require more than that such restoration be made as is reasonably possible and such as the merits of the case demand.

(Citations and punctuation omitted.) *Radio Perry, Inc. v. Cox Communications., Inc.*, 323 Ga. App. 604, 609 (1) (b) (746 SE2d 670) (2013). See also *Smith v. McWhorter*, 173 Ga. 255, 273 (160 SE 250) (1931) ("One rescinding [a] contract is not required to return consideration, when to do so would be unreasonable or impossible.") (citations and punctuation omitted); *Remediation Services, Inc. v. Georgia-Pacific*

22

*Corp.*, 209 Ga. App. 427, 433 (1) (433 SE2d 631) (1993) ("No tender is required where the party seeking to rescind has received nothing of value, or where any amount received under the contract may be less than the amount due to the party seeking to rescind.") (citations omitted).

In this case, the evidence shows that Lee Bank, in exchange for purchasing a $500,000 participation interest from SFG, received its 3.36% share of the loan payments for about a year before the borrower defaulted. As a result of the default, the bank had to charge off $200,000 of the loan as a loss. The bank was also later assessed $247,000 in expenses associated with Venture's servicing of the loan and management of the collateral. According to Venture, it remitted $141,163.94 to Lee Bank. This amount represented Lee Bank's share of the proceeds of the sale of the hotel ($347,695.69) less that portion of expenses due Venture from Lee Bank ($206,531.75). Thus, while Lee Bank received "benefits" under the contract, those benefits only marginally offset its losses. Venture, on the other hand, retained the benefit of Lee Bank's participation interest (which it obtained by purchasing the loan at a discount); moreover, it has recovered from Lee Bank the servicing expenses owed it under the participation agreement by deducting them from the sale of the hotel. Under these circumstances, requiring Lee Bank to remit a check to Venture for

23

the funds it had received pursuant to the participation agreement prior to rescinding the contract would not restore the "status quo" between the parties to the agreement – in fact, Venture was never a part of the original status quo. Arguably, it would put Venture in a superior position. Under such circumstances, we cannot say that the trial court erred in finding that a jury question remained concerning whether Lee Bank's offer to restore to Venture any benefits that it may have received under the agreement was reasonable. See *Intl. Software Solutions, Inc. v. Atlanta Pressure Treated Lumber Co.*, 194 Ga. App. 441 (390 SE2d 659) (1990) ("Restoration does not require that the opposite party be placed in exact status quo, but only that he be placed substantially in his original position, and that the rescinding party shall derive no unconscionable advantage from the rescission. We are satisfied the record before us shows that appellees' in-court offer of restoration of appellant's [property] met these tests.") (citation and emphasis omitted.)

(b) *Breach of Contract*. Venture argues that Lee Bank's breach of contract claims fails because (i) Lee Bank failed to prove "actual damages" and (ii) because Section 10 of the participation agreement, which requires Venture to repurchase Lee Bank's interest in the loan in the event of a material default, constitutes an unenforceable liquidated damages provision. We find no merit to these arguments.

24

Lee Bank has asserted that its actual damages are $500,000 – the amount of its participation interest – plus interest, expenses, and attorney fees. Lee Bank asserts a right to this amount by virtue of Section 10 of the of the participation agreement, which required Venture to repurchase Lee Bank's participation interest in the event of an uncured material default under the agreement. While this amount may be "liquidated" in the sense that it is established both by the amount of Lee Bank's interest in the loan and by the terms of the right-to-repurchase clause, this right-to-repurchase clause is not a liquidated damages provision under Georgia law. A liquidated damages provision is an agreement between the parties to limit recovery for a breach of the contract to a specified amount.[8] Section 10 of the agreement, however, does not so limit the amount of damages recoverable for a breach of the agreement. Rather, by its plain language, it gives Lee Bank the "option," not the obligation or the sole remedy, to demand that Venture repurchase its interest in the event of an uncured material default. This option is expressly "in addition to all other remedies available to it at law or in equity."

---

[8] OCGA § 13-6-7 provides: "If the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby."

Venture argued below that Section 10 of the agreement provides the participant bank with an option to seek a remedy that is in the nature of a specific performance.[9] And Lee Bank argued that it had exercised that option, and that Venture was in material default of the agreement when it did not repurchase. Based upon those allegations, Lee Bank averred in its counterclaim that Venture had breached its obligation to repurchase.

Ultimately, under these circumstances, we conclude that it does not matter how we characterize the repurchase clause. In this case, we hold that the failure to timely repurchase the participation interest upon proof of a material default constitutes an independent breach of the participation agreement that, if proven, would entitle Lee Bank to pursue money damages for the alleged failure to repurchase.[10] See *Sun Am.*

[9] Specific performance is generally available "whenever the damages recoverable at law would not be an adequate compensation for nonperformance." OCGA § 23-2-130.

[10] Georgia's appellate courts have never directly determined whether a repurchase clause in a loan participation agreement amounts to specific performance or is in the nature of liquidated damages provision. Rather, this Court has enforced repurchase clauses similar to the clause at issue in this case, treating the failure to repurchase as a breach of contract in its own right. In *Cleveland Motor Cars, Inc. v. Bank of America*, 295 Ga. App. 100 (670 SE2d 892) (2008), a bank brought suit against a car dealer for failing to repurchase loans it had sold to the bank. In the sale agreement, the dealer "expressly promised to repurchase the loan if a buyer's identity was fraudulent." Id. at 102. We affirmed the grant of summary judgment to the bank,

*Bank v. Fairfield Financial Svcs.*, 690 FSupp2d 1342, 1368 (M.D. Ga. 2010) ("[W]hether [the] repurchase [clause] is construed as liquidated damages or specific performance, it is a reasonable remedy for a serious breach with consequences that cannot be measured."); *ORIX Real Estate Capital Markets, LLC v. Superior Bank, FSB,* 127 F. Supp. 2d 981, 983 (II) (A) (N.D. Ill. 2000) ("The payment of the liquidation price of a loan is payment of an amount of money, which is completely fungible . . . There is [thus] no practical difference between this 'repurchase' remedy and compensatory damages.").

*Judgment reversed in part, vacated in part, and remanded with direction. Dillard and McFadden, JJ., concur.*

---

finding that the dealer had breached the contract by failing to repurchase. In an earlier case, *Rod's Auto Finance, Inc. v. Finance Co.*, 211 Ga. App. 63 (438 SE2d 175) (1993), a finance company purchased auto loans from two car dealers, under an agreement that required the dealers to repurchase the loans if the debtor did not promptly commence making timely payments. We remanded the case to the trial court with instructions to determine whether there remained a genuine issue of material fact concerning whether any debtor failed to make a timely first payment. In the absence of a fact issue, the finance company would be "entitled to summary judgment on its claim that the seller of that account must repurchase it." Id. at 64 (2). In both cases, we held that a repurchase was required upon breach of certain terms of the agreement. Therefore, the subsequent failure to repurchase upon notice of the breach was itself found to be a breach.