**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed. Please refer to the Supreme Court of Georgia Judicial Emergency Order of March 14, 2020 for further information at (https://www.gaappeals.us/rules).**

**June 5, 2020**

# In the Court of Appeals of Georgia

A20A0465. SHIELDS et al. v. RDM, LLC d/b/a GEORGIA ALL STARS.

DILLARD, Presiding Judge.

Kimberly and James Shields appeal from the trial court's grant of summary judgment to RDM, LLC d/b/a Georgia All Stars on claims based on personal injuries Kimberly sustained during an event at Georgia All Stars's facility. Specifically, the Shieldes argue that the trial court erred in granting summary judgment to Georgia All Stars and, in doing so, finding that their claims were barred by the terms of a medical release form signed by Kimberly and the Georgia Recreational Property Act.[1] For the reasons set forth *infra*, we affirm.

---

[1] *See* OCGA § 51-3-20 et seq.

Viewed *de novo* in the light most favorable to the Shieldses (*i.e.*, the nonmoving parties),[2] the record shows that Georgia All Stars offers tumbling instruction and provides competitive all-star cheerleading team programs in its Roswell, Georgia gym.[3] On the day in question, November 19, 2015, Georgia All Stars hosted an exhibition of participants' routines for parents to view in the practice area of the gym. And for this exhibition, the concrete gymnasium floor was covered with purple practice mats, and at least two vendors were there to promote their goods or services.

The Shieldses' daughter was a participant in Special Twist, which is a "special needs all star cheer and dance team." Special Twist is not part of the Georgia All Stars facility or teams, but is instead an independent 501 (3) (c) organization that, under previous ownership, had been permitted to practice in the Georgia All Stars

---

[2] *See, e.g.*, *Gayle v. Frank Callen Boys & Girls Clubs, Inc.*, 322 Ga. App. 412, 412 (745 SE2d 695) (2013) ("A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (punctuation omitted)).

[3] Georgia All Stars rents the gymnasium space and is an "owner" within the meaning of the Recreational Property Act. *See* OCGA § 51-3-21 (3) (defining "Owner" as the "possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises").

facility with volunteer coaches and leadership. Georgia All Stars then adopted and continued the agreement, and Special Twist is charged nothing to use the facilities. Special Twist members were invited to participate in the exhibition on the night in question.

That evening, Special Twist performed an hour later than scheduled, and due to the number of people in attendance and the resulting crowd in the gym, spectators whose children had yet to perform were asked to wait outside. So, when Kimberly was eventually permitted inside the gym to watch Special Twist, she and "about a hundred [other] people" were "crammed into a corner" and stood to watch the performance.

When Special Twist finished performing, the coach took the members to watch other teams perform from the sidelines; but Kimberly and her daughter could not stay for the entire program due to another obligation they had early the next morning. As a result, Kimberly went to look for her daughter, who at the time was less than five feet tall. And as she was walking toward her daughter's team, while attempting to look over other people and navigating through the crowd, Kimberly suddenly fell from the mats at a distance of what she described as two feet onto the concrete floor.

The area where Kimberly fell had not been marked off physically with rope, tape, or cones. And after she fell, a Georgia All Stars employee came over to assist Kimberly and called for an ambulance because she was unable to get up on her own. Then, at the hospital, Kimberly was diagnosed with four breaks between her leg and ankle that required surgery and many months of recovery.

Kimberly was familiar with the layout of the gym and the use of the purple mats because she watched her daughter perform or practice there on at least ten other occasions. But on the night in question, she noticed the mats were stacked in ways she had never seen before, and so she was not expecting the drop off where she fell. Nevertheless, it is undisputed that Georgia All Stars had parents sign releases containing warnings about potential hazards in the gym, and verbal warnings were given at the evening's exhibition.

The Shieldses later filed suit against Georgia All Stars on October 4, 2017, asserting claims of simple negligence and loss of consortium, and seeking attorney fees, litigation costs, and damages. Georgia All Stars answered, and filed a counterclaim against the Shieldses for breach of contract based on a medical release Kimberly signed some months prior to the incident in question. Georgia All Stars later moved for summary judgment on the Shieldses' claims, contending that (1)

Kimberly contractually released it, barring her claims of negligence, and (2) the claims were also barred by the Recreational Property Act.[4] As a result, Georgia All Stars likewise argued that the Shieldses' derivative claims should be dismissed. The trial court agreed that the Shieldses' claims were barred by the medical release and the Recreational Property Act, granting summary judgment in favor of Georgia All Stars. This appeal follows.

1. For starters, the Shieldses argue that the trial court erred by concluding their claims were barred by a medical-release form Kimberly signed months prior to the night of the exhibition. We disagree.

Prior to her daughter's participation in a daily, one-week-long camp at the Georgia All Stars gym, Kimberly signed a medical-release form on July 30, 2015.[5] In doing so, Kimberly understood that the medical release applied to her and her

---

[4] *See* OCGA § 51-3-20 et seq.

[5] Although the deposition transcripts in the appellate record indicate that various exhibits were identified and used during the depositions, including the relevant medical-release form, no exhibits were included with these depositions. Nevertheless, Kimberly read the relevant language contained in the medical-release form into the record during her deposition testimony, and Georgia All Stars included a scanned photograph of what it purports to be the medical-release form with the same language in one of its pleadings below. And because it is undisputed that the form exists and was signed by Kimberly, we will consider the language as reflected by what *is* in the record before us.

daughter, and that the document applied to her or her daughter's participation in events at the gym.

The medical release provides, in relevant part:

In consideration of the services of Georgia All-Star Cheerleading, Inc., its owners, agents, officers, employees and all other persons or entities acting in any capacity on their behalf (hereinafter collectively referred to as GA), I hereby agree to release, discharge, and hold harmless GA on behalf of myself, my children, my parents, my heirs, assigns, personal representative and estates as follows:

I understand and acknowledge that the activities that I or my child engage in while on the premises or under the auspices of GA pose known and unknown risks which could result in injury, paralysis, death, emotional distress, or damages to me, my child, to property, or to third parties. The following describe some, but not all of those risks:

Cheerleading and gymnastics, including performances of stunts and use of trampolines, entail certain risks that simply cannot be eliminated without jeopardizing the essential qualities of the activity. Without a certain degree of risk, cheerleading students would not improve their skills and the enjoyment of the sport would be diminished. Cheerleading and gymnastics expose participants to the usual risk of cuts and bruises, and other more serious risks as well. Participants often fall, sprain, break wrists and ankles, and can suffer from serious injuries. Traveling to and from shows, meets and exhibitions, raises the possibilities of any manner

of transportation accidents. In any event, if you or your child is injured, medical assistance may be required which you must pay for yourself.

I expressly agree and promise to accept and assume all risks, known and unknown, connected with GA related activities, including, but not limited to performance of stunts and the use of trampolines . . .

I hereby voluntarily release, forever discharge, and agree to hold harmless and indemnify GA from any and all liability, claims, demands, actions or rights of action, which are related to, arise out of, or are in any way connected with my child's participation in GA-related activities.

In considering the trial court's grant of summary judgment in favor of Georgia All Stars, we note that summary adjudication is only proper when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[6] And we review a grant or denial of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party.[7] Furthermore, the party opposing

---

[6] *Sadlowski v. Beacon Mgmt. Servs., Inc.*, 348 Ga. App. 585, 587-88 (824 SE2d 42) (2019) (punctuation omitted); *accord Navy Fed. Credit Union v. McCrea*, 337 Ga. App. 103, 105 (1) (786 SE2d 707) (2016).

[7] *Sadlowski*, 348 Ga. App. at 588; *McCrea*, 337 Ga. App. at 105 (1).

summary judgment is "not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact."[8]

Here, the trial court's grant of summary judgment in favor of Georgia All Stars was based, in part, on the medical release signed by Kimberly. The construction of this contract is, of course, "a question of law for the court"[9] that involves three steps:

> The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.[10]

---

[8] *Montgomery Cnty. v. Hamilton*, 337 Ga. App. 500, 502-03 (788 SE2d 89) (2016) (punctuation omitted); *accord Sadlowski*, 348 Ga. App. at 588.

[9] *Bd. of Cm'rs of Crisp Cnty. v. City Cm'rs of the City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012); *accord Shelnutt v. Mayor of Savannah*, 349 Ga. App. 499, 505 (3) (826 SE2d 379) (2019).

[10] *Bd. of Cm'rs of Crisp Cnty.*, 315 Ga. App. at 699 (punctuation & footnotes omitted); *accord Y.C. Dev. Inc. v. Norton*, 344 Ga. App. 69, 73 (1) (806 SE2d 662) (2017).

Suffice it to say, the cardinal rule of contract construction is to "ascertain the intention of the parties, as set out in the language of the contract."[11] Additionally, it is the "paramount public policy of this state that courts will not lightly interfere with the freedom of parties to contract."[12] And a contracting party may "waive or renounce that which the law has established in his or her favor, when it does not thereby injure others or affect the public interest.[13] Finally, exculpatory clauses in Georgia are "valid and binding, and are not void as against public policy when a business relieves itself from its own negligence."[14]

In this case, although Kimberly argues that the medical-release form was only applicable to her daughter's participation in a temporary camp program, nothing in

---

[11] *Stanley v. Gov't Emps. Ins. Co.*, 344 Ga. App. 342, 344 (810 SE2d 179) (2018) (punctuation omitted); *see also Yash Sols., LLC v. New York Glob. Consultants Corp.*, 352 Ga. App. 127, 138 (834 SE2d 126) (2019) (same).

[12] *2010-1 SFG Venture LLC v. Lee Bank & Trust Co.*, 332 Ga. App. 894, 897 (1) (a) (775 SE2d 243) (2015) (punctuation omitted); *accord Neighborhood Assistance Corp. v. Dixon*, 265 Ga. App. 255, 256 (1) (593 SE2d 717) (2004); *My Fair Lady of Ga. v. Harris*, 185 Ga. App. 459, 460 (364 SE2d 580) (1987).

[13] *2010-1 SFG Venture LLC*, 332 Ga. App. at 897 (1) (punctuation omitted); *accord Dixon*, 265 Ga. App. at 256 (1); *Harris*, 185 Ga. App. at 460.

[14] *2010-1 SFG Venture LLC*, 332 Ga. App. at 897 (1) (punctuation omitted); *accord Dixon*, 265 Ga. App. at 256 (1); *Harris*, 185 Ga. App. at 460.

the language of the release limits it to any specific program, event, or time period. Indeed, the plain language of the release states that it is applicable to "the activities that I or my child engage in while on the premises or under the auspices of GA," "all risks, known and unknown, connected with GA related activities," and "participation in GA-related activities." Accordingly, the trial court properly granted summary judgment to Georgia All Stars on the ground that the medical-release form signed by Kimberly barred the claim for negligence related to her fall inside the gym during her daughter's participation in an exhibition.[15] Likewise, the trial court also properly granted summary judgment on the derivative claims for loss of consortium and damages.[16]

---

[15] *See Lovelace v. Figure Salon, Inc.*, 179 Ga. App. 51, 53 (1) (1986) (holding that trial court properly granted summary judgment on plaintiff's claims for personal injury due to alleged negligence when plaintiff signed a release in which she assumed the risk of injury and the defendant disclaimed any liability, and in which the plaintiff agreed not to file suit against the defendant for any injuries she might incur). *Cf. Harris*, 185 Ga. App. at 461 ("Under this factual predicate, where a cause of action is based on the alleged negligence of the club, and there being a valid contractual waiver and release for any action arising out of [the plaintiff's] use of the facilities, which sounded in negligence, the trial court erred in denying [the defendant's] motion for summary judgment.").

[16] *See Lovelace*, 179 Ga. App. at 53 (3) ("The right of the husband to recover for loss of consortium being dependent upon the right of the wife to recover, the court did not err in granting summary judgment to defendant as to the husband's cause of action.").

2. If the medical-release form is the belt of Georgia All Stars's defense to this lawsuit, the protections afforded to property owners by the Recreational Property Act are its suspenders. Indeed, the trial court correctly determined that the Shieldses' claims are also foreclosed by the RPA,[17] whose *codified* purpose is "to encourage both public and private landowners to make their property available to the public for recreational purposes by limiting the owners' liability."[18] To that end, the RPA provides, *inter alia*, that

> [e]xcept as specifically recognized by or provided in Code Section 51-3-25, an owner of land who either directly or indirectly invites or permits *without charge* any person to use the property for recreational purposes does not thereby . . . [a]ssume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.[19]

---

[17] *See* OCGA § 51-3-23 *et seq.*

[18] *S. Gwinnett Athletic Ass'n Inc. v. Nash*, 220 Ga. App. 116, 117 (1) (469 SE2d 276) (1996); *accord Gwinnett Cnty., Ga v. Ashby*, Case No. A20A0602, 2020 WL 1873232, at *3 (Ga. App. April 15, 2020); *see* OCGA § 51-3-20 ("The purpose of this article is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes.").

[19] OCGA § 51-3-23 (3) (emphasis supplied).

11

The RPA defines "charge" to mean "the admission price or fee asked in return for invitation or permission to enter or go upon the land."[20] So, in order to determine whether immunity is available to a property owner under the RPA, a court must make a determination "of the true scope and nature of the landowner's invitation to use its property."[21] And in making this determination, the analysis is "properly informed" by "two related considerations: (1) the nature of the activity that constitutes the use of the property in which people have been invited to engage, and (2) the nature of the property that people have been invited to use."[22] In other words, "the first asks whether the activity in which the public was invited to engage was of a kind that qualifies as recreational under the Act, and the second asks whether at the relevant time the property was of a sort that is used primarily for recreational purposes or primarily for commercial activity."[23]

Here, the Shieldses do not dispute that the activity in question—attending a free exhibition of cheerleading participants' routines—was "recreational" within the

---

[20] OCGA § 51-3-21 (1).

[21] *Mercer Univ. v. Stofer*, 306 Ga. 191, 191 (830 SE2d 169) (2019).

[22] *Id.* at 191.

[23] *Id.* at 196.

meaning of the RPA. Instead, they maintain that "a material question of fact exists as to the purpose behind [Georgia All Stars's] allowance of [their] daughter's use of the facility, which relates directly to whether the operation of . . . the gym constitutes a commercial or recreational venture." This argument is a nonstarter.

There is no evidence or suggestion that Georgia All Stars charged an admission price or fee to attend the exhibition in question. To the contrary, the evidence shows that Georgia All Stars did not charge the members of Special Twist *anything* to use the facilities for practice at any time.[24] And the presence of vendors at the exhibition does not change our conclusion. Indeed, as our Supreme Court recently explained in *Mercer University v. Stofer*,[25] "[i]t is not the law—and we have never said that it was—that inviting people to use recreational property for recreational activities could still fail to qualify for immunity under the Act solely because the landowner had some

---

[24] *See Nash*, 220 Ga. App. at 117-18 (1) ("In the current case, the Association charges a little league registration fee, although this fee is waived as to any child in need of free service. The fee covers expenses such as uniforms for the children, umpires, lights, water and sanitation. Because the fee is needed to defray the costs of operating the league, and is not an admission price required for permission to enter onto the land, it is not a charge to the public as contemplated by the Act.").

[25] 306 Ga. 191 (830 SE2d 169) (2019).

sort of subjective profit motive in doing so."[26] Instead, the relevant question is whether "the landowner actually invited people onto the property (directly or indirectly) to do something 'recreational,' or whether people have instead been allowed onto the property to engage in commercial activity."[27] And in this case, the evidence shows that "both the nature of the activity and the nature of the property at the time of the [gymnastics exhibition] were purely recreational."[28] There is no evidence that any attendees were required to make purchases from the vendors, that the exhibition was held for the benefit of the vendors, or that Georgia All Stars in any way profited from vendor sales.[29] To put it plainly, this case is the poster child for

---

[26] *Id.* at 200 (3); *accord Mercer Univ. v. Stofer*, __ Ga. App. __, __ (1) (841 SE2d 224, 226 (1)) (2020) ("Importantly, a landowner's subjective profit motivations are irrelevant to the analysis.").

[27] *Stofer*, 306 Ga. at 196 (2).

[28] *Stofer*, __ Ga. App. at __ (1) (841 SE2d 224, 227-28 (1)).

[29] *See id.* at __ (1) (841 SE2d 224, 228 (1)) ("To the extent that the concert series may have increased Mercer [University]'s name recognition and good will in the community, potential student interest in attending the university, or the likelihood that it would receive future grant funding, such speculative considerations and subjective motivations are not relevant to our analysis. Notably, there is no evidence that Mercer made a profit from the vendors, the sponsors, or . . . branded give-aways, nor is there evidence that it received a direct financial benefit from the concert series whatsoever. The fact that there might have been an indirect commercial benefit is not sufficient to create a factual question." (citation omitted)).

14

immunity under the RPA, and the trial court did not err in concluding that the Shieldses' claims were barred under the statute.

For all these reasons, we affirm the trial court's grant of summary judgment to Georgia All Stars.

*Judgment affirmed. Rickman and Brown, JJ., concur.*