[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14258
Non-Argument Calendar

_____

D.C. Docket No. 1:12-cv-02513-SCJ

SILVERPOP SYSTEMS, INC.,

Plaintiff – Counter Defendant – Appellee,

versus

LEADING MARKET TECHNOLOGIES, INC.,

Defendant – Counter Claimant – Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 5, 2016)

Before TJOFLAT and MARTIN, Circuit Judges, and ROSENTHAL,[*] District Judge.


PER CURIAM:


We AFFIRM the District Court's well-reasoned and thorough decision for the reasons stated in the Court's order of February 14, 2014.  A copy of that order is attached below.

AFFIRMED.

---

[*] The Honorable Lee H. Rosenthal, U.S. District Judge for the Southern District of Texas, sitting by designation.

2

# APPENDIX[†]

# ORDER

This matter is before the Court on Plaintiff's motions to compel discovery [Doc. Nos. 45 and 47],[1] motion for summary judgment [Doc. No. 53], and motions in limine [Doc. No. 65 and 66],[2] and Defendant's motion for partial summary judgment [Doc. No. 52].

## I. FACTUAL BACKGROUND

Plaintiff Silverpop Systems, Inc. ("Silverpop") provides digital marketing services to businesses such as Defendant Leading Market Technologies, Inc. ("LMT"). On January 24, 2005, Silverpop and LMT entered into a service agreement whereby LMT was authorized to access Silverpop's web-based e-mail marketing tool (Engage). In accordance with the terms of the agreement, LMT would upload digital advertising content and recipient e-mail addresses to the Engage system. That advertising content would then be transmitted to the e-mail addresses provided. The list of e-mail addresses provided by LMT was stored on the Engage system. LMT's master e-mail address list was comprised of the e-mail address of every person to have ever registered for its MarketBrowser software. LMT would upload select e-mail addresses from its master list to the Engage system. As a result, as of November 2010, Silverpop had in its possession a list containing the e-mail addresses of 495,591 users of LMT's MarketBrower software ("LMT List").

In November 2010, Silverpop's computer network experienced an unauthorized intrusion by unidentified parties ("hackers") who gained access to the information stored on the Engage system by 110 of Silverpop's 1,500 customers("data breach"). LMT was one of the customers affected by the data breach. According to Silverpop, although it was apparent that the hackers had created export files, it could not be confirmed that the export files were taken out

---

[†] The District Court's Order of February 14, 2014, is reproduced here in relevant part. Only the formatting and numbering have been changed.

[1] Following the filing of the motions to compel, the parties represented to the Court their intent to resolve the underlying discovery dispute without the need for Court action. Relying on that representation and in the absence of an indication that the parties' discovery dispute remains unresolved, the motions to compel are DISMISSED AS MOOT.

[2] Plaintiff's second motion in limine [Doc. No. 66] is incorrectly identified as such. It is in fact the memorandum in support of the contemporaneously filed motion in limine [Doc. No. 65]. Plaintiff is notified that it is unnecessary to file a motion and its supporting memorandum as separate docket entries. Here, there is only one motion in limine pending before the Court [Doc. No. 65], but, for the purposes of docket clarity and consistency, the Court lists both docket entries as representing the motion in limine.

of the Engage system.  Thus, according to Silverpop, it could not confirm that data files (including the LMT List) were exported out of the system by a third party.

On November 30, 2010, Silverpop informed LMT of the data breach.  After learning of the incident, LMT considered the contract "suspended."[3]  Although LMT continued to use the services provided by Silverpop for a few months following the breach, it did not make payments for those services. Finally, in May 2011, Silverpop discontinued LMT's access to the Engage system for non-payment.  According to LMT, it was operating under an understanding with Silverpop that the question of payment would be resolved after the parties came to an agreement on whether to renew the contract when it came ripe for renewal. Silverpop contends that it never offered to provide LMT with free services.

On July 19, 2012, Silverpop filed this action, seeking a judgment declaring that LMT was not damaged by the data breach or that the damages incurred were consequential damages and, as such, not recoverable under the terms of agreement (Count I) and seeking payment from LMT for the services provided following the data breach (Count II).  LMT counterclaimed, alleging fraud (Count I), based on Silverpop's alleged misrepresentations of the security precautions in place, and breach of contract (Count II) and negligence (Count III), based on Silverpop's failure to keep LMT's list secure.

Silverpop contends that it is entitled to summary judgment on all counts of LMT Counterclaim, while LMT argues that it is entitled to summary judgment on Count I of its Counterclaim and on Silverpop's attorneys' fees request.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    LEGAL STANDARD

Federal Rules of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4]

---

[3] The parties agreement does not provide for a suspension of the contract.

[4] On December 1, 2010, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. The amendments to Rule 56 "are intended to improve the procedures for presenting and deciding summary-judgment motions" and "are not intended to change the summary-judgment standard or burdens." *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011) (internal quotation marks and emphasis omitted). "[B]ecause the summary judgment standard remains the same, the amendments will not affect continuing development of the decisional law construing and applying the standard now articulated in Rule 56(a). Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to

2

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## B.    DISCUSSION

### 1.    LMT'S COUNTERCLAIM FOR FRAUD

In its response in opposition to Silverpop's motion for summary judgment, LMT concedes that its claim for fraud is subject to dismissal [Doc. No. 68, p.2 n.1 ("LMT chooses not to rescind the contract and proceed in fraud") and p.28 ("LMT agrees with Silverpop that it cannot pursue its fraud claims, because it has not formally rescinded the contract and because it was willing to go along with an interim agreement to continue to accept services provisionally after the incident.")]. Accordingly, summary judgment on Count I of the Counterclaim is GRANTED in favor of Silverpop and Count I of the Counterclaim is DISMISSED.

cite to decisional law construing and applying prior versions of the Rule." *Murray v. Ingram*, No. 3:10-CV-348-MEF, 2011 WL 671604, *2 (M.D. Ala. Feb. 3, 2011) (internal quotation marks and citations omitted).

## 2.   LMT'S COUNTERCLAIM FOR NEGLIGENCE

To prevail on a claim for negligence under Georgia law, the plaintiff must establish

(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Watson v. Gen. Mech. Servs., Inc.*, 276 Ga. App. 479, 481, 623 S.E.2d 679, 681 (2005) (quoting *Bradley Ctr., Inc. v. Wessner*, 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982)). Here, assuming, *arguendo*, that Silverpop had a duty to conform its conduct to a particular standard to protect against incidents resulting in a data breach, LMT has failed to present evidence to establish the applicable standard of care. "Evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence." *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180 (5th Cir. 1975). Silverpop contends that LMT's expert has not proposed any standards that are ordinarily employed in Silverpop's industry, and LMT fails to rebut this contention. Overall, while LMT highlights several deficiencies in Silverpop's intrusion detection system, it offers no evidence to establish how Silverpop's practices, as they related to intrusion detection, failed to meet the applicable standard of care. Accordingly, as LMT has failed to present evidence establishing the standard of care that governed Silverpop's actions, it cannot establish a breach of the standard of care.

Alternatively, LMT's negligence claim is barred by the economic loss rule. The rule "generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *Gen. Elec. Co. v. Lowe's Home Centers, Inc.*, 279 Ga. 77, 78, 608 S.E.2d 636, 637 (2005). However, the economic loss rule does not prevent the recover in tort of "those economic losses resulting from injury to [a plaintiff's] person or damage to his property." *Id.* "[B]oth the Georgia Supreme Court and [the Georgia Court of Appeals] have applied the economic loss rule outside of product liability cases." *City of Atlanta v. Benator*, 310 Ga. App. 597, 605, 714 S.E.2d 109, 116 (2011).

4

Here, the parties disagree over whether the economic loss doctrine to this case applies to bar LMT's recovery under its claim of negligence. Silverpop argues that the issue here is whether it adequately performed the contract and thus an action for recovery here may be brought only in contract and not in tort. LMT contends that the economic loss rule does not prevent its recovery in tort because it is seeking to recover for damages to its property (the LMT List) that was not the subject of the service agreement between the parties. According to LMT, the LMT List was property outside of the subject of the contract and the List lost all value as a saleable asset because no reasonable business would buy a list which had been the subject of a data breach.

Where a party to a contract suffers damage to property that is not the subject of the contract, Georgia courts allow for recovery in tort on the premise that "the duty breached in such situations generally arises independent of the contract." *Bates & Associates, Inc. v. Romei*, 207 Ga. App. 81, 83, 426 S.E.2d 919, 921 (1993); *see also Young v. W.S. Badcock Corp.*, 222 Ga. App. 218, 474 S.E.2d 87, 89 (1996) (quoting *Unified Svcs. v. Home Ins. Co.*, 218 Ga. App. 85, 87(4), 460 S.E.2d 545 (1995)) ("[A] tort action cannot be based on the breach of a contractual duty only, [but] it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law."); *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 948 (11th Cir. 1982) ("The [economic loss] rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty . . . or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract . . . .").

The bar presented by the economic loss rule cannot be circumvented here because the duty at issue is one arising under the contract itself. LMT contends that its list represented confidential information and Silverpop's duty to protect against the disclosure of the LMT List arose from the fact that it "agreed to accept, store, and safeguard" the LMT List [Doc. No. 68, 23]. However, assuming that the LMT List contained confidential information, Silverpop's duty to protect the LMT List arose under Section 4.1 of the parties' agreement, wherein it agreed to protect against the disclosure of proprietary information (defined as "confidential information" under the agreement [Doc. No. 1-1, p.7]).[5] LMT identifies no other

---

[5] Section 4.1 provides:

> Each party hereunder may disclose to the other party certain Proprietary Information of such party . . . . Recipient agrees to hold the Proprietary Information disclosed by Owner in strictest confidence and not to, directly or indirectly . . . disclose, cause to be disclosed, or otherwise transfer the Proprietary Information disclosed by Owner to any third party . . .

[Doc. No. 1-1, p.4].

5

source for Silverpop's duty to safeguard the LMT List.  Thus, to recover its damages LMT must proceed under the contract.

LMT also argues that the accident and the misrepresentation exceptions to the economic loss rule apply to its claim of negligence.  The accident exception "allows a plaintiff to recover in tort when there is a sudden and calamitous event that not only causes damage to the product but poses an unreasonable risk of injury to persons and other property." *Advanced Drainage Sys., Inc. v. Lowman*, 210 Ga. App. 731, 734, 437 S.E.2d 604, 607 (1993).  According to LMT, the incident resulting in the data breach was a sudden and calamitous event that caused damage to its property.  LMT cites no authority that supports the application of the accident exception outside the realms of a product liability action, much less to this case.

Under the accident exception, a plaintiff may "recover for damages to the defective product itself, where the injury resulted from an accident." *Flintkote Co.*, 678 F.2d at 948.  Here, the parties' agreement encompassed a service and not a product.  But even if the Engage system was considered a "product" that LMT had the rights to access under the agreement, the accident exception does not apply because LMT does not seek to recover for any damage suffered by the "product itself."  Moreover, LMT offers no explanation as to why the data breach incident constitutes "a calamity, sudden violence, collision with another object, or some catastrophic event," justifying the application of the accident exception. *Busbee v. Chrysler Corp.*, 240 Ga. App. 664, 666, 524 S.E.2d 539, 542 (1999).  Thus, there is no basis to apply the accident exception here.

LMT's recourse to the misrepresentation exception is also unavailing.  The misrepresentation exception to the application of the economic loss rule recognizes that

> one who supplies information . . . in any transaction in which he has a
> pecuniary interest has a duty of reasonable care and competence to
> parties who rely upon the information in circumstances in which the
> maker was manifestly aware of the use to which the information was
> to be put and intended that it be so used.

*Advanced Drainage Sys., Inc. v. Lowman*, 210 Ga. App. 731, 734, 437 S.E.2d 604, 607 (1993) (quoting *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 681-682, 300 S.E.2d 503 (1983).  Here, LMT has conceded its fraud claim and its Counterclaim provides no allegations of misrepresentation with regard to its cause of action for negligence.  In the fashion of a shotgun pleading, the count of

6

negligence in the Counterclaim indiscriminately incorporates by reference all of the preceding allegations (including allegations of misrepresentation alleged in support of the claim for fraud). But the sole stated basis for the negligence claim is Silverpop's failure to protect against the data breach [Doc. No. 4, p.13, ¶17]. Accordingly, the misrepresentation exception does not apply to LMT's negligence claim. *See Home Depot U.S.A., Inc. v. Wabash Nat. Corp.*, 314 Ga. App. 360, 366, 724 S.E.2d 53, 59 (2012) (concluding that while "fraud and negligent misrepresentation claims . . . fell within the misrepresentation exception" to the economic loss rule a claim based on any other tort would have to be encompassed by another exception to the rule to survive dismissal); *City of Cairo v. Hightower Consulting Engineers, Inc.*, 278 Ga. App. 721, 729, 629 S.E.2d 518, 525 (2006) (concluding that the misrepresentation exception to the economic loss rule applied because the plaintiff had asserted a clam for negligent misrepresentation).

Overall, Silverpop is entitled to summary judgement on LMT's claim of negligence because LMT has failed to establish the applicable standard of care and the breach of that standard and, alternatively, because the economic loss rule applies to bar LMT's recovery in tort.

## 3. LMT'S COUNTERCLAIM FOR BREACH OF CONTRACT[6]

Each of the parties seeks summary judgment in its favor on LMT's breach of contract claim. According to LMT, it is entitled to summary judgment because Silverpop breached Section 4.1 of the parties' agreement by failing to protect the LMT List from disclosure to third parties, the damages it incurred as a result of the breach were direct rather than consequential and, thus, recoverable under the contract, and even if those damages were consequential, its recovery is not barred under the damages limitation provision of the contract. Silverpop, on the other hand, argues that it is entitled to summary judgment on LMT's claim of breach of contract because LMT cannot prove its damages, cannot establish that its damages were caused by Silverpop's alleged breach of the contract, and cannot recover the damages it seeks because they are consequential damages and the contract bars the recovery of such damages.

In analyzing the cross motions for summary judgment on LMT's breach of contract claim, the Court first addresses whether the damages LMT seeks are consequential rather than direct. It is important here to categorize the damages sought as either consequential or direct because while the parties' agreement does

---

[6] In accordance with the choice of law provision, parties' agreement is governed by Georgia law [Doc. No. 1, Ex. A, ¶11.3].

not prohibit the recovery of direct damages, the damages limitation provision of the agreement, to the extent it is applicable, prohibits the recovery of consequential damages.

LMT seeks to recoup the lost sale value of its list. It argues that Silverpop was bound under the contract to protect the LMT List from disclosure to third parties. According to LMT, Silverpop did not have in place adequate security measures to protect against the November 2010 data breach and, as a result, an unauthorized third party was able to access the LMT List. LMT contends that its list, as it existed before the data breach, had a certain value as an asset that could be sold but that its sale value was reduced to zero after the data breach. According to LMT, no reasonable business would purchase the LMT List for marketing purposes once it had been accessed (and very likely exported) by a hacker.[7] Assuming, *arguendo*, that the sale value of the LMT List, as it existed prior to the data breach, was reduced to zero following that breach and that the LMT List was a confidential document that Silverpop was required to protect from disclosure under Section 4.1 of the parties' agreement, the question that must be answered is which of the two categories of damages (direct or consequential) does the loss of sale value fall under.

"The general rule applicable here is that damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach [i.e., general damages] and such as the parties contemplated, when the contract was made, as the probable result of its breach [i.e., consequential damages]." *Denny v. Nutt*, 189 Ga. App. 387, 388, 375 S.E.2d 878, 879 (1988) (internal quotation marks omitted) (alternations in original). So stated, however, the rule does little to further one's understanding of the type of damages that may "arise naturally from the contract" as opposed to the type that may be the "probable result of the breach." The Court finds it helpful to consider general (i.e., direct) damages as those damages that compensate for "the value of the very performance promised" and consequential damages as those damages that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 175–76 (2d Cir. 2000) (internal quotation marks omitted). *See also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App.

---

[7] LMT theorizes that once in the hands of a hacker, the LMT List could be sold to any number of parties, which would reduce its exclusivity, and the e-mail addresses on the LMT List would be at the risk of spam attacks, which would make the address owners more wary about marketing e-mails even if sent by a business that had acquired the address through legitimate means (e.g., by purchasing the List from LMT).

8

641, 646, 490 S.E.2d 124, 129 (1997) (direct damages included loss of the benefit of the bargain).

Here, LMT's damages are best characterized as consequential. LMT argues that it seeks to recover the lost market value of the LMT List and that lost market value is a direct injury rather than consequential damages. The two cases LMT cites for the proposition that lost market value represents direct damages are inapposite. In *NUCO Invs., Inc. v. Hartford Fire Ins. Co.*, No. 1:02 CV 1622 CAP, 2005 WL 3307089 (N.D. Ga. Dec. 5, 2005), the plaintiff sought to recover under an insurance policy the lost market value of a mold-damaged property. This Court concluded that a loss in value represented direct damages recoverable under the insurance contract based on the understanding that physical damage causes a loss in both the utility and the value of property and that the insurer, having agreed to pay for physical damage, was bound to pay for the loss in value. The *NUCO* Court's analysis is unhelpful here.[8] Here, the parties' agreement was not one for the safeguarding of the LMT List. Rather, the parties contracted for the providing of e-mail marketing services. While it was necessary for LMT to provide a list of intended recipients (represented as e-mail addresses on the LMT List) to ensure that the service Silverpop provided (targeted e-mail marketing) was carried out, the safe storage of the list was not the purpose of the agreement between the parties. Thus, in the face of a breach of the service agreement by Silverpop, LMT would incur direct damages in the form of a loss of the value (e.g., the money it had paid for the service) of the performance it had been promised. Here, considering the nature of the breach, LMT also suffered a loss in the sale value of the LMT List. That loss, however, is a loss that is separate from the loss of the value of the performance itself. The loss LMT seeks to recover is not of the type that would naturally flow from a breach of contract, irrespective of the actual provision breached by Silverpop. Rather, the loss suffered by LMT is of a type resulting from the breach of a specific term of the agreement. In the absence of a breach of the confidentiality provision, LMT would not have incurred the loss to the sale value of the LMT List. Thus, considering the purpose of the parties' agreement, the damages LMT seeks are not the type that "arise naturally and from the usual course of things." LMT's damages are consequential rather than direct.

Next, the Court addresses whether the damages limitation provision of the parties' agreement bars LMT's recovery of its consequential damages.[9] Silverpop

---

[8] LMT's reliance on *Metro. Atlanta Rapid Transit Auth. v. Dendy*, 250 Ga. 538, 299 S.E.2d 876 (1983), is equally unavailing. That case concerned the plaintiff's claim for compensation based on the market value of a condemnation action.

[9] Under Georgia law, "[t]o the extent that consequential damages are recoverable in breach of contract actions, a clause excluding such damages is valid and binding unless prohibited by statute or public policy." *Mark Singleton*

9

argues that the recovery of consequential damages is barred under Section 10.1 of the agreement, which provides: "In no event will Silverpop . . . be liable to the other party . . . for any . . . consequential damages . . . in any way relating to this agreement . . ." [Doc. No. 1-1, p.5]. LMT argues that this limitation does not apply because it claims a breach of Section 4 of the agreement and the agreement expressly provides that the damages limitation provision does not apply to damages from a breach of that section. This argument fails, however, as the exemption language LMT relies on is included in Section 10.2 (providing a maximum liability cap) of the agreement[10] rather than Section 10.1 and modifies only the provision pertaining to the maximum liability Silverpop may incur. There is no indication that the exemption is intended to encompass the consequential damages limitation of Section 10.1.

LMT next argues that Section 10 did not survive the termination of the contract and, thus, it cannot serve as a bar to its recovery. Section 5.4 of the agreement provides: "Termination of this Agreement by either party . . . will terminate each party's obligations under this Agreement except for Sections 4, 6, 7, 8, and 9, all of which survive termination of this Agreement" ("survival provision") [Doc. No. 1-1, 4]. LMT contends that because Section 10 was not included as a provision that would survive the termination of the agreement it was extinguished once the agreement was terminated. Silverpop supplies a two part rebuttal: (1) the damages limitation provision concerns the allocation of risk in the instance of a breach rather than an obligation that would terminate along with the contract and (2) the survival provision has no bearing on the application on the damages limitation provision because the conduct giving rise to LMT's claim occurred while the agreement was in force and the parties' rights with relation to recovery of damages became fixed in accordance with the application of the then viable damages limitation provision.

Silverpop's arguments have merit. The parties' agreement states that their obligations under the agreement terminate once the agreement is terminated. This statement does not represent a novel interpretation. "[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 206 (1991). While contractual obligations may expire upon the termination of a contract, provisions that are

---

*Buick, Inc. v. Taylor*, 194 Ga. App. 630, 633, 391 S.E.2d 435, 437 (1990) (internal citation omitted). There is no contention that the damages limitation provision is so prohibited.

[10] Section 10.2 limits Silverpop's damages to fees received during the twelve months preceding a breach. This limitation is then followed by a disclaimer stating, "This damages limitation shall not apply to a breach of sections 4 and 6" [Doc. No. 1-1, 5].

structural (e.g., relating to remedies and the resolution of disputes) may survive that termination. *Goshawk Dedicated v. Portsmouth Settlement Co. I*, 466 F. Supp. 2d 1293, 1300 (N.D. Ga. 2006). *See also TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 752 F. Supp. 2d 517, 534 (E.D. Pa. 2010) amended on other ground on reconsideration, No. 10-1054, 2011 WL 204738 (E.D. Pa. Jan. 21, 2011) (rejecting the argument that the forum selection did not apply to parties' dispute because it was not one of the enumerated provisions that survived the termination of the contract).

LMT argues that a contract is nothing more than a recitation of statements of mutual obligations and, in essence, argues that the term "obligations" in the survival provision encompass all the terms and provisions included in the agreement. Thus, according to LMT, the only provisions that survived the termination of the parties' agreement were those specific provisions (Sections 4, 6, 7, 8, and 9) which were expressly exempted from termination. LMT further argues that if "obligations" was intended to be restricted to performance obligations only then there would have been no need to selectively exempt certain provisions not dealing with performance obligations (i.e., Sections 8 and 9) from termination.

Adoption of LMT's arguments, however, would lead to an anomalous result. For example, the choice of law provision in the agreement (which does not represent a performance obligation) would be extinguished. While the agreement was in force, the choice of law provision in the agreement would dictate the state law to be applied to any suit filed under the agreement, but that choice of law provision would no longer govern if the suit was filed over the same incident following the agreement's termination. There is no cogent reason why the parties would have elected to apply the law of a particular state to a dispute litigated while the agreement was in force but have allowed for uncertainty as to the state law that would govern any dispute litigated following the termination of the agreement.

On the other hand, construing the survival clause as limited to the performance obligations of the agreement properly gives meaning to the relevant provisions. Under that interpretation, structural provisions (such as the choice of law provision) remain unaffected by the termination of the agreement and apply uniformly regardless of whether the agreement is in force or has been terminated. The damages limitation provision in the parties' agreement is not a performance obligation that is extinguished upon an agreement's termination. Rather, that provision, which limits the damages LMT may recoup, is more akin to a structural provision governing remedies and the resolution of disputes under a contract. As

11

such, the damages limitation provision survived termination and applies to bar LMT's claim for consequential damages.[11]

Alternatively, the Court agrees with Silverpop that the survival provision has no bearing on LMT's claim for consequential damages. Although the parties disagree as to when the agreement was terminated, it is certain that the agreement was in force when the data breach giving rise to LMT's claim occurred and that it remained in force for a period following the data breach. Thus, the agreement was in force at the time of Silverpop's alleged breach, and LMT's rights to damages were fixed in accordance with the provisions of the agreement. LMT had waived its right to consequential damages under the agreement and that waiver applied to restrict the damages LMT could recover for Silverpop's breach. LMT cannot recapture that waiver now that the agreement has been terminated.

To summarize, the damages LMT seeks are consequential, and the damages limitation provision in the parties' agreement applies to bar the recovery of these damages. As such, Silverpop is entitled to summary judgment on LMT's claim for breach of contract and, consequently, LMT is not entitled to summary judgment in its favor on this claim.

## 4. SILVERPOP'S REQUEST FOR ATTORNEYS' FEES

Silverpop's Complaint includes a request for attorneys' fees under O.C.G.A. § 13-6-11. In its motion for partial summary judgment, LMT argues for the dismissal of Silverpop's claim for attorneys' fees. Section 13-6-11 authorizes the award of attorneys' fees "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." In opposing summary judgment on this issue, Silverpop correctly states the standard for an award of attorneys' fees but fails to present any evidence as to its entitlement to the recovery of fees in this instance.

Moreover, the Complaint presents no facts to support the requested award. First, there are no facts alleged to support an award under the "bad faith" standard. The Complaint alleges that LMT breached the parties' agreement by failing to

---

[11] Moreover, holding that the termination of the parties' agreement extinguished the damages limitation provision would render meaningless the limitation liability provision to the extent it represents the parties agreement that "*in no event* will Silverpop . . . be liable to the other party . . . for any . . . consequential damages . . . in any way relating to this agreement . . ." [Doc. No. 1-1, p.5] (emphasis added). Under LMT's interpretation of the survival provision, the "in no event" term of the damages limitation provision would have to be qualified to read that LMT could recover consequential damages in no event unless the contract had been terminated.

12

make payments for the services it received following the data breach. However, a party's failure to make payments under a contract standing alone does not constitute bad faith as contemplated by § 13-6-11. *Pulte Home Corp. v. Woodland Nursery & Landscapes, Inc.*, 230 Ga. App. 455, 457, 496 S.E.2d 546, 550 (1998) ("A recovery of OCGA § 13-6-11 attorney's fees in a contract action must be based upon evidence which shows more than a mere breach of contract.). Rather a showing of bad faith in entering or in performing the contract is required. No such allegation is made in the Complaint. Second, attorneys' fees may not be recovered on the basis of stubborn litigiousness or on the basis of the plaintiff having incurred unnecessary expense where "the record shows the existence of a bona fide controversy as to reasons for which [the defendant] would have no contractual liability to [the plaintiff]." *Williams Tile & Marble Co., Inc. v. Ra-Lin & Associates, Inc.*, 206 Ga. App. 750, 752, 426 S.E.2d 598, 601 (1992). Here, the record reveals a bona fide controversy as to LMT's liability under the contract: for example, LMT asserts that it did not make payments on the contract following the data breach pursuant to the representations made by a Silverpop employee and Silverpop asserts that it never agreed to provide its services for free. Accordingly, summary judgment in favor of LMT is warranted on Silverpop's request for attorneys' fees, as the request is not supported by the facts as pled in the Complaint and as Silverpop has failed to come forward with evidence at the summary judgment stage to shore up its fees request.

## III. CONCLUSION

For the above-stated reasons, Plaintiff's motions to compel discovery [Doc. Nos. 45 and 47] are **DISMISSED AS MOOT**, motion for summary judgment [Doc. No. 53] is **GRANTED**, and motions in limine [Doc. No. 65 and 66] is **DISMISSED AS MOOT**, and Defendant's motion for partial summary judgment [Doc. No. 52] is **GRANTED IN PART**. Specifically, Defendant's motion is **DENIED** as to its Counterclaim Count II and is **GRANTED** as to Plaintiff's request for attorneys' fees.

13