**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3387

_____

OMS3, LLC,
                    Appellant

v.

CARESTREAM DENTAL, LLC

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:18-cv-03505)
District Judge: Honorable Joshua D. Wolson

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 22, 2021

Before: SMITH, *Chief Judge**, McKEE, and RESTREPO, *Circuit Judges.*

(Filed: December 14, 2021)

_____

OPINION**

_____

---

* Judge Smith was Chief Judge at the time this appeal was submitted. Judge Smith completed his term as Chief Judge and assumed senior status on December 4, 2021.

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

RESTREPO, *Circuit Judge*.

Two technology companies operating in the healthcare space, OMS3, LLC and Carestream Dental, LLC, entered into a marketing agreement in 2012. Subject to the agreement are two products that the parties sought to integrate: (1) OMS3's Practice Pilot, a data visualization software, and (2) Carestream Dental's WinOMS, a practice management software. OMS3 claims that Carestream failed to refer customers to OMS3 per the terms of the agreement's exclusive marketing commitments and therefore is liable for breach of contract. Carestream seeks declaratory relief that the agreement is terminable at will.

In 2020, the parties filed cross-motions for summary judgment. The District Court granted summary judgment in favor of Carestream, finding that OMS3's breach of contract claim failed because it did not identify recoverable damages under Georgia law. For the reasons set forth below, we will affirm.

## I.

As part of the marketing agreement, OMS3 and Carestream contracted for certain exclusive marketing commitments. Under § 5(a), OMS3 agreed to "not offer [Practice Pilot], or any other variation of its Practice Pilot application or a substantially similar application, for use with any other vendor's oral surgery practice management software products."[1] In exchange, Carestream undertook a referral commitment whereby it agreed

---

[1] The marketing agreement is available at J.A. 215-21.

to refer prospective customers to OMS3 in sufficient quantities so that OMS3 will close sales of Carestream Referred Sales as defined in Section 2(b)[2] in the following quantities:

  (i) by the end of the first year after the Effective Date:[3] at least 143 primary licenses sold; and

  (ii) by the end of [the] second year after the Effective Date: at least 285 primary licenses sold (in aggregate, including year 1 sales)[.]

§ 5(b). "If the sales targets described in 5(b) are not achieved in either the first or the second year, OMS3 may, within 30 days after the end of that year, elect to terminate its exclusive marketing commitment in Section 5(a)[.]" § 5(c)(i). OMS3 and Carestream also bargained to limit their liability, such that "[n]either party will be liable to the other for any incidental, consequential or special damages under this Agreement." § 7. Finally, they included a merger clause in the agreement, as well as a Georgia choice-of-law provision. *See* §§ 12(c), (f).

As relevant here, OMS3 did not achieve § 5(b)'s target sales. The parties disagree over the exact number of referrals that Carestream made in the first and second year. According to Carestream, it "referred thousands of prospective customers to OMS3 . . . largely through mailing campaigns[.]" Appellee's Br. 7 (citing J.A. 767-69). OMS3 maintains

---

[2] Pursuant to § 2(b) of the agreement, a Carestream Referral Sale occurs if OMS3 makes a sale to a customer, where a "Carestream sales representative must have directed the customer to the [Practice Pilot] landing page, where the customer must have completed the information on the landing page necessary to request a [Practice Pilot] demonstration, which information, at a minimum, must include the customer name and contact information and the name of the Carestream sales representative responsible for the referral."

[3] The agreement defines Effective Date as September 12, 2012. J.A. 215.

that Carestream made only ten referrals during the first two years.[4]  Nevertheless, OMS3 had the option to, but elected not to, voluntarily terminate its exclusivity commitment.  *See* J.A. 235-38 (OMS3's CEO, Sean Wild, testifying that terminating § 5(a)'s exclusivity commitment, pursuant to OMS3's discretion under § 5(c)(i) given that the target sales under § 5(b) were not achieved, would have been a "horrible option").

In July 2018, OMS3 filed a breach of contract action in state court claiming that Carestream failed to perform its referral obligations under § 5(b).  OMS3 requested damages in excess of $50,000, to account for lost profits as a result of the alleged breach and harm to its brand and reputation.  Carestream removed the case to federal court and asserted a counterclaim seeking declaratory relief as to the agreement's at-will terminability.  In 2020, OMS3 moved for partial summary judgment on its breach of contract claim, and Carestream sought summary judgment on its declaratory judgment claim in addition to OMS3's breach of contract claim.  The District Court granted Carestream's motion, finding that the agreement barred recovery of consequential damages and thus OMS3 could not satisfy the damages element of its breach of contract claim.  OMS3 files a timely appeal.[5]

---

[4] According to OMS3, two of the ten referrals resulted in Carestream Referred Sales.

[5] As Carestream notes, OMS3's appeal is silent as to the District Court's grant of summary judgment in favor of Carestream on its declaratory judgment claim.  In response, OMS3 suggests that the declaratory judgment claim is still undecided.  *See* Reply Br. 10 ("[T]he District Court did not decide the substance of Carestream's Counterclaim[.]").  But the District Court granted Carestream's motion for summary judgment in full, and OMS3 failed to preserve a challenge to the District Court's ruling on the declaratory judgment claim.  *See Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 145-

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's grant of summary judgment. *See Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 580-81 (3d Cir. 2009). Applying the same standard as a district court, summary judgment is proper if, viewing all facts and inferences in favor of the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020). "We may affirm a district court for any reason supported by the record." *Brightwell v. Lehman*, 637 F.3d 187, 191 (3d Cir. 2011).

## III.

Under Georgia law, there are three elements to a breach of contract claim: "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."[6] *Norton v. Budget Rent A Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010) (internal quotations and citation omitted). The District Court found that OMS3 failed to satisfy the resultant damages element. We agree.

---

46 (3d Cir. 2017) ("[A]n appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal. . . . Nor will we reach arguments raised for the first time in a reply brief[.]"); *see also In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

[6] Neither OMS3 nor Carestream dispute the District Court's finding that Georgia law applies to the claims at issue. Accordingly, we will also apply Georgia law.

OMS3 seeks damages for lost profits. There are two types recognized under Georgia law: "(1) lost profits which are direct damages and represent the benefit of the bargain[,] . . . and (2) lost profits which are indirect or consequential damages[.]" *Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997). Lost profits which are direct damages include "profits necessarily inherent in the contract," *e.g.*, "a general contractor suing for the remainder of the contract price less his saved expenses[.]" *Id.* at 127; *see also Mitchell & Assocs., Inc. v. Glob. Sys. Integration, Inc.*, 844 S.E.2d 551, 554 (Ga. Ct. App. 2020) (concluding that the lost profits at issue were direct, rather than consequential, damages as they "'can be traced solely to' [the party's] breach of the Agreement 'and are the immediate fruit of' that contract") (quoting *Aon Risk Servs. of Georgia v. Com. & Mil. Sys. Co.*, 607 S.E.2d 157, 161 (Ga. Ct. App. 2004)). On the other hand, lost profits which are indirect or consequential damages include "profits which might accrue collaterally as a result of the contract's performance" – *e.g.*, damages incurred by the operator of a medical diagnostic device if that device stopped working and the operator "was unable to perform diagnostic services for several patients." *Imaging Sys. Int'l*, 490 S.E.2d at 127.

OMS3 argues that the lost profits it seeks are direct damages. This is not so. OMS3 "seeks compensation for Carestream's promised performance of its Referral Obligation in the form of lost profits resulting directly from Carestream's breach of its Referral Obligation – *i.e.*, the 'consideration' that Carestream promised to OMS3 in exchange for OMS3's Promised Exclusivity[.]" Appellant's Br. 25; *see also* Compl. ¶¶ 57-60. But as the District Court explained,

> OMS3's ability to realize [sales of Carestream Referred Sales] depended on more than just receiving a referral from Carestream. It had to close the sale after the referral, and its ability to do so depended on a range of non-contractual factors, such as price, quality, the availability of substitutes, and the skill of OMS3's sales force. In that regard, it is important to note that Carestream did not have a contractual obligation to ensure that OMS3 made a certain number of sales. It only had an obligation to refer to OMS3 enough customers to permit OMS3 to make an expected number of sales. Carestream could have complied with that obligation (and might have, depending on the resolution of certain factual questions) even if OMS3 did not close those sales.

J.A. 7-8. The lost profits that OMS3 seeks are collateral to Carestream's performance of the contract. *See Imaging Sys. Int'l*, 490 S.E.2d at 127. In other words, they are not "the immediate fruit of" the agreement. *Mitchell & Assocs.*, 844 S.E.2d at 554. Therefore, given that the agreement bars recovery of consequential damages,[7] *see* § 7, OMS3 has failed to satisfy the resulting damages element of its breach of contract claim.[8]

---

[7] "Georgia, like many states, enforces limitation of damages provisions (sometimes called limitation of liability provisions) between sophisticated business persons." *US Nitrogen, LLC v. Weatherly, Inc.*, 343 F. Supp. 3d. 1354, 1358 (N.D. Ga. 2018) (citing *2010-1 SFG Venture LLC v. Lee Bank & Trust Co.*, 775 S.E.2d 243 (Ga. Ct. App. 2015)). A limitation of liability provision "excluding the recovery for consequential damages is valid and enforceable, unless prohibited by statute or public policy." *Am. Car Rentals, Inc. v. Walden Leasing, Inc.*, 469 S.E.2d 431, 433 (Ga. Ct. App. 1996) (citation omitted); *see also Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 856-57, 856 n.9 (11th Cir. 2016) (enforcing a limitation of liability provision that excludes recovery for consequential damages) (citing *Mark Singleton Buick, Inc. v. Taylor*, 391 S.E.2d 435, 437 (Ga. Ct. App. 1990)). The parties do not dispute the enforceability of the agreement's limitation of liability provision, nor do we see any reason to question its enforceability.

[8] OMS3 also claimed damages as a result of harm to its brand and reputation. The District Court found that these constituted consequential damages barred by the terms of the agreement. OMS3 does not challenge this finding on appeal, nor are there grounds to diverge from it. *See Imaging Sys. Int'l*, 490 S.E.2d at 127.

OMS3 contends that this conclusion reduces Carestream's referral obligation to an illusory promise, or "something less than a contractual obligation," and "renders Carestream immune from liability for any breach of the Referral Obligation." Appellant's Br. 15-16. It also suggests that this conclusion is dependent upon reading § 5(c)'s termination provision as the exclusive remedy. But OMS3's attempts to interject ambiguity and confusion into the bargained-for agreement will not save its breach of contract claim. *See Super98, LLC v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368, 1378-79 (N.D. Ga. 2018) (citing 11 Williston on Contracts § 32.11 (4th ed. 2017) ("[C]ourts will not indulge in artificial interpretations . . . in order to save a party from a bad bargain.")). And it is not the role of this Court to rewrite the parties' marketing agreement. *See Freund v. Warren*, 740 S.E.2d 727, 730 (Ga. Ct. App. 2013).

**IV.**

For these reasons, we will affirm the order of the District Court granting summary judgment in favor of Carestream.