**FIRST DIVISION
BARNES, P. J.,
LAND and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**November 3, 2023**

# In the Court of Appeals of Georgia

A23A0808, A23A0809. HI TECHNOLOGY CORP. v. QUALITY & INVESTMENT PROPERTIES SUWANEE, LLC; and vice versa.

WATKINS, Judge.

In these cross-appeals from a case involving claims for beach of contract and defamation, the parties appeal the trial court's rulings on their competing motions for summary judgment. The trial court concluded that although the remedies and limitation of liability clauses in the parties' agreement did not completely bar the plaintiff's breach of contract claims, the defendant's liability was capped at $1 million. The trial court also concluded that the defendant's counterclaim for defamation can proceed. We reverse in part, as we conclude that summary judgment should have been granted as to one of the bases for the defamation counterclaim, and otherwise affirm the trial court's rulings.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" OCGA § 9-11-56 (c). "We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate."[1]

So viewed, the record shows that HI Technology Corporation, formerly known as InComm Holdings, Inc. ("InComm"), is a global financial services company that facilitates over $50 billion in annual transactions, primarily by selling and activating gift cards for companies such as American Express, Target, Best Buy, and Walmart. Quality Investment Properties Suwanee, LLC ("QTS"), is a provider of data center services, including data center space, power, and connectivity. On December 20, 2019, InComm's suite at the QTS data center lost power, disrupting InComm's ability to sell and activate gift cards on one of the busiest shopping days of the year.

InComm and QTS entered into their master space agreement in September 2013, under which QTS agreed to provide InComm with physical space and services in

---

[1] (Citation omitted). *Brown v. Sapp*, 351 Ga. App. 352 (829 SE2d 169) (2019).

2

QTS's professional data center. The agreement provided that because InComm selected the "redundant power supply" option, QTS would guarantee that power would be available in InComm's suite 99.999 percent of the time. The agreement further identified the remedy InComm would receive if QTS failed to provide the specified level of service, relevantly providing that if power was unavailable for more than 86 minutes in a given month, InComm would receive a "service level credit" of 10.6 percent of its total monthly recurring charge. The agreement also contained a consequential damages waiver providing that the parties would have no liability for damages to each other except, as relevant to this appeal, in cases of gross negligence or intentional misconduct, and in such circumstances their liability would be capped at $1 million. The parties subsequently renewed their agreement through March 31, 2020.

On December 20, 2019, the data center experienced a power outage, and a portion of InComm's suite was without power for approximately two hours. InComm received a service credit of $17,269.48 on its monthly invoice.

Six months later, InComm filed suit against QTS, raising claims for breach of contract, declaratory judgment (as to the enforceability of the provisions of the

agreement waiving or limiting QTS's liability for damages) and attorney fees.[2] InComm alleged that it lost tens of millions of dollars due to the outage and contended that QTS was "grossly negligent and intentional" in how it installed and operated the power configuration to InComm's suite. QTS filed a counterclaim for defamation, alleging that InComm employees made false statements to QTS customers about the power outage. The parties filed cross-motions for summary judgment, and the trial court concluded that QTS was potentially liable for breach of contract but that its liability was limited to, at most, $1 million. Thus, the trial court granted QTS's motion for summary judgment with respect to alleged damages in excess of $1 million and denied the motion as to all other claims. The trial court also denied InComm's motion for summary judgment to the extent it sought damages over $1 million. In a separate order, the trial court denied InComm's motion for summary judgment as to QTS's counterclaim for defamation. The parties then filed these appeals.

---

[2] InComm also raised a tort claim for gross negligence, but the trial court granted QTS's motion to dismiss that claim, ruling that InComm's tort claim was barred by the economic loss rule. See *Gen. Elec. Co. v. Lowe's Home Centers*, 279 Ga. 77, 78 (1) (608 SE2d 636) (2005) ("The 'economic loss rule' generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort."). InComm does not challenge that ruling on appeal.

1. QTS contends that pursuant to the parties' agreement, particularly Section 5 of the addendum, contractually-established credits are InComm's sole and exclusive remedy for the breaches alleged in this case. It is undisputed that, after the power outage, QTS paid InComm $17,269.48 in such "Service Level Credits." QTS maintains that InComm is not entitled to any additional recovery.

The addendum to the parties' master space agreement provides:

5.2 *Power Guarantee.* Except in the event of Facilities Maintenance, Customer Maintenance and Force Majeure conditions, QTS shall have the contracted power available for the Customer as follows: 99.999% of the time during the Term of this Addendum when configured with redundant power, or if the Customer does not choose the redundant power option on the Customer order form, 99.99% of the time during this Addendum ("Power Guarantee").

*Power Remedy.* In the event QTS fails to provide the level of service provided in the Power Guarantee, Customer shall receive the applicable remedy ("Service Level Credit") described below.

[The agreement then includes a chart indicating the service level credit to be awarded for each scenario.]

The addendum also provides:

5.7

5

*Remedies.*

> a) If, during the term of this Addendum, QTS fails to meet [the] Power Guarantee, . . . Customer shall be entitled to receive, as its sole and exclusive remedy, the applicable Service Level Credits described in Section[] 5.2 . . . of this Addendum.

QTS asserts that because all of the damages InComm alleges in this case arose from the loss of power in its suite, Service Level Credits, which QTS already paid, were InComm's "sole and exclusive remedy" pursuant to Section 5.7. QTS acknowledges that InComm has argued that QTS breached the parties' agreement in several ways — including by failing to maintain and provide backup power in accordance with industry standards, as required by Section 1.2 (c) of the addendum, and by failing to configure InComm's suite with redundant power — but argues that those alleged breaches are "irrelevant" because all of InComm's purported damages were the result of the loss of power.

"The cardinal rule of contract construction is to ascertain the intention of the parties. . . . When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent."[3] By its terms,

---

[3] (Citation omitted.) *Unified Govt. of Athens-Clarke County v. Stiles Apts.*, 295 Ga. 829, 832 (1) (764 SE2d 403) (2014).

6

the Section 5.7 Remedies provision applies in the event QTS fails to meet a service level guarantee. Nothing in that provision addresses what remedies are available in the event QTS breaches other portions of the parties' agreement. Consequently, we reject QTS's argument on this issue and conclude, as did the trial court, that service level credits are not the sole and exclusive remedy available to InComm for the breaches alleged in this case.[4]

2. The parties raise competing challenges to the trial court's interpretation of their consequential damages waiver, which provides:

> 6.3 *Consequential Damages Waiver.* IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY TYPE OF INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST REVENUE, LOST PROFITS, REPLACEMENT GOODS, LOSS OF TECHNOLOGY, RIGHTS OR SERVICES, LOSS OF DATA, OR INTERRUPTION OR LOSS OF USE OF SERVICE OR EQUIPMENT, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND WHETHER ARISING UNDER THEORY OF CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE. THE FOREGOING LIMITATION OF LIABILITY DAMAGES SHALL NOT APPLY TO: (I) A BREACH BY EITHER

---

[4] In doing so, we note that to obtain a judgment, InComm will still need to establish that it experienced damages as a result of the breaches it alleges.

PARTY OF THE CONFIDENTIALITY OBLIGATIONS IN SECTION 7[;] (II) A BREACH BY CUSTOMER OF THE AUP[;] OR (III) *AS A RESULT OF LIABILITY ARISING FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, PROVIDED, HOWEVER, ANY DAMAGES ALLOWED PURSUANT TO THIS SECTION 6.[3] (III) SHALL NOT EXCEED ONE MILLION DOLLARS ($1,000,000).*[5]

As we consider the parties' arguments, we bear in mind that under Georgia law, "the freedom of contract is sacrosanct" and "should not be limited absent some important public policy reason."[6] Thus, "[a]bsent a public policy interest, contracting parties are free to contract to waive numerous and substantial rights, including the right to seek recourse in the event of breach by the other party."[7] We have routinely concluded that "[e]xculpatory clauses in Georgia are valid and binding, and are not void as against public policy when a business relieves itself from its own negligence."[8] But, as discussed in more detail later in this opinion, we have also stated, in cases

[5] (Emphasis supplied).

[6] *PNC Bank, Nat. Assn. v. Smith*, 298 Ga. 818, 822 (3) (a) (785 SE2d 505) (2016).

[7] (Citation omitted.) *Flanigan v. Exec. Office Centers, Inc.*, 249 Ga. App. 14, 15 (1) (546 SE2d 559) (2001).

[8] *My Fair Lady v. Harris*, 185 Ga. App. 459, 460 (364 SE2d 580) (1987).

8

involving tort claims, that "exculpatory clauses do not relieve a party from liability for acts of gross negligence or wilful or wanton conduct."[9]

(a) QTS argues that the trial court erred by failing to rule that InComm's breach of contract claims are completely barred by the parties' consequential damages waiver. We reject this position and conclude, as did the trial court, that grossly negligent breaches of conduct fall within the waiver's third exception.

In support of its position, QTS emphasizes that the consequential damages waiver bars the parties from recovering a wide variety of damages, "whether arising under theory of contract, tort, strict liability, or otherwise[.]" We agree that the broad language of the waiver appears to encompass all of the damages InComm is seeking in its breach of contract claims.

But QTS further argues that InComm's claims do not fall within any exception to the consequential damages waiver. Specifically, QTS contends that the claims do not fall within the third exception to the waiver, which provides: "the foregoing limitation of liability damages shall not apply: . . . (III) as a result of liability arising

---

[9] (Footnotes omitted.) *Colonial Properties Realty v. Lowder Constr. Co.*, 256 Ga. App. 106, 112 (5) (567 SE2d 389) (2002).

9

from a party's gross negligence or intentional misconduct[.]" QTS asserts that only tort claims can fall within this exception because a party can incur "liability" for gross negligence only if it has an independent legal duty outside the parties' contract.

The trial court correctly observed, however, that Georgia law recognizes the concept of "gross negligence" in the context of a breach of contract claim as well as in a tort claim.[10] In *SFG Venture*, the agreement provided that the contracting party

> shall not be liable for any action taken or omitted to be taken by it or by any of its employees, members, officers, managers, contractors or agents, or any of them, for any errors of judgment under, or in connection with this Agreement, or any of the Loan Documents, *except in the case of gross negligence or willful misconduct*.[11]

On appeal, the opposing party argued that the limitation of liability clause was ambiguous as to whether it applied to breach of contract claims.[12] We rejected this argument, noting "it is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort claim as well[,]" and concluding that the clause at issue "limited the party's potential liability for breaches of the

---

[10] See *2010-1 SFG Venture LLC v. Lee Bank & Trust Co.*, 332 Ga. App. 894, 895 (775 SE2d 243) (2015).

[11] (Punctuation omitted; emphasis supplied.) Id.

[12] Id. at 900 (1) (b).

10

agreement to those breaches arising from a specific type of conduct — gross negligence or willful misconduct."[13]

Considering the parties' consequential damages waiver in its entirety, we reject QTS's assertion that only tort claims can fall within the waiver's gross negligence exception. We acknowledge that the exception refers to a party's "gross negligence" rather than, for example, "grossly negligent conduct," which might suggest that it is intended to include only "gross negligence" causes of action. But the exception also provides that damages will be allowed "as a result of liability arising from" the identified conduct, not that damages will be allowed "for" gross negligence. Most importantly, the exception itself does not provide that it is applicable only to tort claims — even though the parties distinguished between tort, contract, strict liability, and other theories of recovery earlier in the provision. Accordingly, we hold that the trial court did not err in concluding that InComm's claims are not barred by the consequential damages waiver.

(b)  InComm argues that the trial court erroneously ruled that the consequential damages waiver limits QTS's liability for grossly negligent breaches of contract to $1 million. In support of its argument, InComm emphasizes the general principle that a

_____

[13] (Citation and punctuation omitted.) Id.

party cannot relieve itself of liability for gross negligence.[14] InComm contends that the trial court erred in concluding that this policy prohibition applies only to tort claims and not also to breach of contract claims like the ones at issue here, and it argues that embracing a distinction between tort and breach of contract claims in this context would "create bad public policy" because it would incentivize parties to breach contracts with impunity. InComm further asserts that the trial court drew a "false distinction" between damages waivers and damages caps. Under InComm's position, the parties' consequential damages waiver cannot operate to place *any* limit on QTS's liability for gross negligence.

We agree with InComm's observation that in various cases where we recited the rule that a party cannot relieve itself of liability for gross negligence, we did not state that the rule applies only to tort claims.[15] Nonetheless, all of the cases identified by

---

[14] See *Colonial Properties*, 256 Ga. App. at 112 (5).

[15] See, e.g., *Aliera Healthcare, Inc. v. Anabaptist Healthshare,* 355 Ga. App. 381, 393 (4) (844 SE2d 268) (2020) ("Limitation-of-liability clauses may not relieve a party from 'liability for acts of gross negligence or wilful or wanton conduct.'") (citation omitted); *Holmes v. Clear Channel Outdoor, Inc.*, 284 Ga. App. 474, 477 (2) (644 SE2d 311) (2007) ("Exculpatory clauses in which a business relieves itself from its own negligence are valid and binding in this State, and are not void as against public policy unless they purport to relieve liability for acts of gross negligence or wilful or wanton conduct."); *Lenny's, Inc. v. Allied Sign Erectors, Inc.*, 170 Ga. App. 706, 708 (2) (318 SE2d 140) (1984) ("A clause in a contract limiting one's liability for

12

InComm involved tort claims.[16] Additionally, InComm has not identified any public policy concern that is implicated by the limitation of liability clause at issue in this case, except to assert that, in the face of breach of contract claims as well as tort claims, parties should never be incentivized to engage in grossly negligent conduct.

As the trial court observed, we have previously recognized a distinction between a party's ability to limit tort liability and its ability to limit breach of contract liability.[17] In *Underwood*, a construction company's bookkeeper signed a personal guaranty for a loan that was issued to the company (her employer). Under the guaranty's waiver provision, the bookkeeper agreed that her obligations as a guarantor "shall not be

---

negligent acts does not serve to limit one's liability for wilful or wanton conduct.").

[16] See, e.g., *Aliera*, 355 Ga. App. at 390 (3) (c) (in case involving a contract between parties that provided health insurance to individuals, opposing party brought claims for breach of contract and breach of fiduciary duty, which is an intentional tort under *Schinazi v. Eden*, 338 Ga. App. 793, 801 (4) (b) (792 SE2d 94) (2016)); *Holmes*, 284 Ga. App. at 474 (independent contractor who was injured while working on a billboard brought negligence claims against the billboard company, alleging that the company breached its duty to keep the premises safe and was negligent in constructing and maintaining the premises); *Lenny's*, 170 Ga. App. at 708-709 (2) & (3) (after a business's sign caught fire and its fire monitoring system proved to be inadequate, business brought claims for negligence and breach of contract against the sign manufacturer and the company that had provided the monitoring system).

[17] See *Underwood v. NationsBanc Real Estate Svcs., Inc.*, 221 Ga. App. 351 (471 SE2d 291) (1996).

released, in whole or in part, by any action or thing which might, but for this provision of this guaranty, be deemed a legal or equitable discharge of a surety or guarantor."[18] Eventually the construction company defaulted on the loan and the bank sued the bookkeeper on the guaranty, seeking to recover the deficiency. The bookkeeper argued that she had been discharged from liability on the guaranty because, in relevant part, the bank wrongly advanced funds on that loan and used them to cover other debts the company owed the bank.[19] The bookkeeper described the bank's assignment of funds as "gross negligence or wanton and willful conduct" and argued that the guaranty could not be interpreted as waiving any bank conduct beyond "simple negligence."[20] We rejected the bookkeeper's argument, stating: "This is not a tort case involving a release[.]"[21] InComm distinguishes the instant case from *Underwood* on various grounds, but its distinctions are not persuasive in light of our clear statement, in *Underwood*, that the case's status as "not a tort case" was a determining factor in

---

[18] Id. at 352.

[19] Id. at 353.

[20] Id.

[21] Id.

14

whether the exculpatory clause relieved the bank of liability for conduct beyond simple negligence.

We also agree with QTS that, considering other contexts where Georgia law draws a distinction between a party's liability in tort and in breach of contract, a distinction makes sense in this context as well. For instance, under the economic loss rule, "a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort."[22] As another example, "[p]unitive damages are not recoverable in actions for breach of contract, even if the breaching party did so in bad faith," though they may be awarded in tort.[23] We also recognize that federal courts applying Georgia law have long seen a distinction between a party's ability to relieve itself of liability for breach of contract and its ability to limit its liability in tort.[24]

------

[22] See *Gen. Elec. Co.*, 279 Ga. at 78 (1).

[23] *Walia v. Walia*, 356 Ga. App. 387, 391 (3) (847 SE2d 8) (2020).

[24] See *Doty Communications, Inc. v. L.M. Berry & Co.*, 417 F.Supp.2d 1355, 1359 (2) (N.D. Ga. 2006) ("Limitations of liability clauses . . . are enforceable under Georgia law unless the defendants' conduct gives rise to a tort claim for gross negligence or wanton or willful conduct."); *Alghadeer Bakery & Mkt., Inc. v. WorldPay US, Inc.*, Case No. 1-16-CV-3627-AT, *12 (2017 U.S. Dist. LEXIS 217817, 2017 WL 7550764) (N.D. Ga. Dec. 18, 2017) (reviewing Georgia law and concluding that "exculpatory clauses are invalid in the *tort claim* context if the other party acted willfully or wantonly, but this principle does not apply in the contract claim context") (emphasis in original).

Regarding a distinction between a damages cap and a damages waiver, we again agree with the trial court that Georgia courts have viewed such provisions differently. In *Precision Planning*, an architect and a developer agreed to limit the architect's liability to the developer to "$50,000 or the amount of the [architect's] fee, whichever is greater."[25] The developer subsequently argued that the clause was void as against public policy in light of a statutory provision forbidding indemnification and hold-harmless agreements in certain construction-related contexts. We rejected the developer's argument and concluded that the parties' limitation-of-liability agreement did not violate the statute and was enforceable. In our opinion, we emphasized that the parties' contract "did not purport to indemnify or hold the architect harmless from damages but simply established a bargained-for cap on the liability of the architect to the developer for the architect's breach or negligence."[26]

Ultimately, as we consider whether public policy concerns render the provision at issue in this case unenforceable, we must bear in mind that "[i]t is the paramount public policy of this state that courts will not lightly interfere with the freedom of

---

[25] *Precision Planning, Inc. v. Richmark Communities, Inc.*, 298 Ga. App. 78, 79 (1) (679 SE2d 43) (2009).

[26] Id. at 80 (1).

16

parties to contract."[27] Here, in a contract for the provision of data center services, two sophisticated commercial parties with apparently equal bargaining power agreed to limit their potential liability to each other to damages arising from grossly negligent or intentional misconduct and to cap their liability at no more than $1 million. As we have previously recognized,

> inclusion of a limitation of liability provision in a contract of this nature recognizes that the fee for the service is small compared to the substantial liability which could arise from an error in providing the service. The provision reflects an arms-length bargain to perform the service at the agreed-upon fee in return for the liability cap.[28]

Indeed, in the "Basis of the Bargain" clause of the parties' agreement, which immediately followed the agreement's consequential damages waiver provision, the parties explicitly stated that they had set their prices and entered into the agreement "in reliance upon the limitations of liability, remedies, damages, and the disclaimers of warranties and damages set forth herein[.]" The waiver and limitation of liability has no effect on the parties' liability to third parties, and they have not identified any

---

[27] (Citation and punctuation omitted.) *My Fair Lady*, 185 Ga. App. at 460.

[28] *RSN Properties, Inc. v. Engineering Consulting Services, Ltd.*, 301 Ga. App. 52, 54 (686 SE2d 853) (2009).

statute prohibiting a data services center from limiting its liability to a client. "Under these circumstances, we find that the limitation of liability provision in the contract represented a reasonable allocation of risks in an arms-length business transaction,"[29] and conclude, as did the trial court, that QTS's liability to InComm for grossly negligent breaches of contract is limited to $1 million.

3. InComm argues that the trial court erred by denying its motion for summary judgment on QTS's defamation claim. As the basis for this claim, QTS alleged that individuals at InComm communicated false information about the power outage to individuals at Pandora/SiriusXM and Baker Donelson — companies that were current or potential QTS customers. InComm contends that it is entitled to summary judgment because QTS failed to establish that InComm published any specific communication to a third party and because QTS failed to establish that any alleged statement about the outage was false.

A cause of action for defamation has four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the

_____

[29] Id. at 54-55.

18

actionability of the statement irrespective of special harm."[30] "The defamatory statement must be published, and a plaintiff cannot prove publication without introducing evidence of the specific statement used in an allegedly defamatory communication."[31]

(a)   As to statements InComm allegedly made to Pandora/SiriusXM, the record does not establish a specific defamatory statement made by anyone at InComm to anyone at Pandora/SiriusXM. InComm contends that in the absence of such showing, the claim cannot survive summary judgment. QTS, however, maintains that the evidence in the record is sufficient to create an inference of such a communication.

In support of its argument, QTS asserts, first, that "the evidence shows that 'the CTO [Chief Technology Officer] of InComm knows the CTO of Sirius/Pandora.'" But the record does not establish this relationship as an undisputed fact. Indeed, although a QTS employee sent internal colleagues an e-mail warning that InComm's CTO knew SiriusXM's CTO, InComm's CTO testified that he did not know any executive-level employee of Pandora/SiriusXM. Moreover, the employee who advised QTS leadership

[30] (Citation and punctuation omitted.) *Infinite Energy v. Pardue*, 310 Ga. App. 355, 356 (1) (713 SE2d 456) (2011).

[31] (Citation and punctuation omitted.) *Grace v. Lowery*, 359 Ga. App. 881, 883 (860 SE2d 159) (2021).

of the CTO-to-CTO relationship was merely repeating an assertion he had heard from someone else, and he did not know whether the executives had spoken about the outage.

QTS further asserts that, based on the timing of communications that have been established, a fact-finder can infer the existence of a defamatory statement from InComm to Sirius XM. QTS points out that an InComm executive sent an internal e-mail identifying SiriusXM's negotiations with QTS regarding future data center services as "[l]everage on QTS." Later, SiriusXM asked QTS questions about the outage which arguably suggested that SiriusXM believed the outage was more severe than it actually was.

But the record also establishes that InComm and SiriusXM, who were business partners themselves, discussed the power outage as it was occurring: on the morning of December 20, SiriusXM contacted InComm to ask why payment transactions InComm handled for SiriusXM were failing, and InComm advised of the power outage and provided subsequent updates. Additionally, an individual at InComm forwarded InComm's Investigation Report of the incident to an individual at SiriusXM; that report stated, in relevant part, that the data center experienced a power failure at "05:20:00 ET" and that "utility power" was restored "[a]t 2:30 p.m. ET[.]" When

20

SiriusXM later emailed QTS asking for details on the power outage, the timeframe SiriusXM mentioned — "05:20:00 ET" until "14:30:00 ET" — matched the times listed in the investigation report.[32]

Considering all of this evidence, even in the light most favorable to QTS, we conclude that the record fails to establish a genuine dispute as to whether InComm made a false statement about the outage to SiriusXM. Crucially, QTS has not identified any specific false statement made by anyone at InComm to anyone at SiriusXM.[33] And under the facts of this case, we are not persuaded by QTS's argument that, given the timing of various communications, such a statement must be inferred. "[F]or an inference drawn from circumstantial evidence to be sufficient to create a genuine issue of fact precluding summary judgment, it must be reasonable and must amount to more

---

[32] Noting that SiriusXM appeared to believe that InComm's suite was entirely without power until 2:30 p.m. or later, QTS argues that InComm's description of the timeframe and severity of the outage was misleading. But a QTS employee testified that the outage caused impact to customers by 5:19 a.m. and that"utility power" was not restored until 2:30 p.m., though generator power was restored earlier. Additionally, in discovery responses, QTS averred that InComm's suite lost power around 5:00 a.m. and that although some systems came back online when power was restored two hours later, InComm's services were disrupted for 14 hours.

[33] See *Grace*, 359 Ga. App. at 883 (On a defamation claim, "vague testimony, which fails to identify any particular words or statements made by Appellants, affords no basis for recovery[.]").

than mere speculation, conjecture, or possibility."[34] Here, QTS's contention that InComm made a false statement about the outage to Pandora/SiriusXM is no more than speculation. InComm is, therefore, entitled to summary judgment on this claim.

(b) QTS also claims that InComm made a defamatory statement to Carl Scaffidi, an executive at Baker Donelson.

The record establishes that Scaffidi was the Chief Information Security Officer for Baker Donelson until February 2020, when he took on the same role at InComm. Baker Donelson, like InComm, contracted with QTS for data center services. Scaffidi first learned of the December 2019 power outage during a lunch with InComm employees, at which time he was still working for Baker Donelson but had already accepted an offer to join InComm. He also discussed the outage, briefly, over lunch with InComm's CTO.

On January 30, 2020, while still employed by Baker Donelson, Scaffidi toured the QTS data center. According to QTS, during that tour, Scaffidi stated to a QTS employee that InComm had told him the power outage resulted in the entire data center being down for 11 hours. Scaffidi, however, testified that he did not make such a

---

[34] (Citation omitted.) *Brown v. Dickerson*, 350 Ga. App. 137, 141 (828 SE2d 376) (2019).

22

statement and that he had never heard such a thing from anyone at InComm or from anyone else.

On appeal, InComm argues that the only evidence of a defamatory statement from InComm to Baker Donelson is "inadmissible multi-layered hearsay" — a QTS employee's statement that Scaffidi told him that he (Scaffidi) had heard from InComm that the entire data center was without power for 11 hours. InComm, however, did not raise a hearsay objection before the trial court, so it is barred from doing so on appeal.

> [U]nder Georgia's former Evidence Code, erroneously admitted hearsay was of no probative value and could not be considered. However, under the new Rules of Evidence [OCGA § 24-8-802], "if a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible." And an objection raised in a party's brief on appeal, as [InComm] has done here, is not the required contemporaneous objection.[35]

Consequently, QTS's evidence as to what Scaffidi said during the tour is admissible. And in light of this evidence, there is a genuine dispute of material fact as to whether InComm falsely told Baker Donelson that the outage caused the entire data center to lose power for 11 hours.

---

[35] (Citations omitted.) *Patterson v. Kevon, LLC*, 304 Ga. 232, 234 n. 3 (818 SE2d 575) (2018).

23

InComm alternatively argues that, even if an individual at InComm did tell Baker Donelson that the outage left QTS's entire data center without power for 11 hours, that statement was substantially true and therefore cannot serve as the basis for a defamation claim.[36] We reject this argument. Among other reasons, it is undisputed that the outage affected only a portion of InComm's suite, not the entire data center.

For the foregoing reasons, we conclude that, to the extent QTS's counterclaim for defamation is based on a purported communication to SiriusXM/Pandora, InComm is entitled to summary judgment. To the extent the counterclaim is based on a communication to Baker Donelson, however, the trial court correctly denied InComm's motion for summary judgment.

4. Finally, QTS argues that even if the sole-and-exclusive remedy provision and consequential damages waiver do not bar InComm's claims, the vast majority of InComm's alleged damages are unrecoverable under Georgia law.

---

[36] See *Swindall v. Cox Enterprises, Inc.*, 253 Ga. App. 235, 236 (558 SE2d 788) (2002) ("Minor factual errors which do not go to the substance, the gist, the sting of a story do not render a communication false for defamation purposes.") (citation and punctuation omitted).

(a)   QTS contends it is entitled to summary judgment on InComm's claim for "goodwill payments," which InComm made to its own customers after they were affected by the power outage. According to QTS, these payments were not contemplated by the parties when they formed their agreement and are too arbitrary, speculative, and remote to be recovered.

Under OCGA § 13-6-2,

> [d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach.

QTS correctly contends that if a "plaintiff's claim for damages is remote or speculative, summary judgment for the defendant is appropriate."[37] But as we have recognized, "[t]he rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages."[38] This is not a case where the plaintiff has failed to substantiate the amount of damages it seeks; indeed, QTS does not contend

---

[37] *The Hip Pocket v. Levi Strauss & Co.*, 144 Ga. App. 792, 794 (2) (242 SE2d 305) (1978).

[38] (Citation omitted.) *Crosby v. Spencer*, 207 Ga. App. 487, 488 (1) (428 SE2d 607) (1993).

that InComm failed to establish the amount it paid to its customers.[39] Instead, QTS's

argument concerns whether the "goodwill payments" InComm made to its customers

arose naturally from QTS's breach of the agreement and were contemplated by the

parties at the time the contract was entered. This is an issue that must be resolved by

the jury, not on summary judgment.[40]

QTS further asserts that recovery for the "goodwill payments" is barred by the

voluntary payment doctrine because InComm had no contractual or legal obligation to

make those payments.[41] But as we have previously observed, the voluntary payment

---

[39] See *Fed. Ins. Co. v. Westside Supply Co.*, 264 Ga. App. 240, 248 (10) (590 SE2d 224) (2003) (rejecting defendant's claim that damages were too remote or speculative where plaintiff established the face value of the checks it had written and provided opinion testimony as to the value of the goods at issue).

[40] See *Leader Nat. Ins. Co. v. Smith*, 177 Ga. App. 267, 279 (339 SE2d 321) (1985) (whether the full amount of damages sought comes within the measure of damages allowed by law is a jury question). See also *American Pest Control v. Pritchett*, 201 Ga. App. 808, 810 (2) (412 SE2d 590) (1991) (in a case where plaintiffs discovered termite damage after buying a house for $35,000 and a building contractor testified that repairing the damage would cost $97,000, the question of whether repairing the house was "an absurd undertaking" was within the sound discretion of the jury).

[41] See OCGA § 13-1-13 ("Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of

doctrine generally "bars the recovery of *excess* payments [made by one party to the opposing party], not payments made to a third party who is not involved in the litigation."[42] Here, InComm did not pay any "claim" to its customers, and it is not asking QTS to refund any money it previously paid to QTS.

(b) QTS argues that InComm's payment of "indemnification costs" to American Express for costs relating to consumer arbitrations is likewise unrecoverable. As discussed above, however, a jury must determine whether these costs were foreseeable to the parties when they entered their agreement.

(c) In its final claim of error, QTS argues that it is entitled to summary judgment on the issue of prejudgment interest.[43]

---

person or property."); see also *Southern Mut. Church Ins. Co. v. ARS Mechanical, LLC*, 306 Ga. App. 748, 752-754 (1) (703 SE2d 363) (2010) (after insurance company mistakenly issued payment on a claim of loss that was excluded from the insured's policy, voluntary payment doctrine barred insurance company from seeking a refund).

[42] (Citations omitted; emphasis in original.) *Hibbard v. McMillan*, 284 Ga. App. 753, 756 (2) (645 SE2d 356) (2007).

[43] We note that InComm did not include a claim for prejudgment interest in its complaint. This is not fatal to InComm's ability to recover prejudgment interest because, "as long as there is a demand for prejudgment interest prior to the entry of final judgment," it can be awarded. *Crisler v. Haugabook*, 290 Ga. 863, 864 (725 SE2d 318) (2012).

Before the trial court, InComm cited both OCGA § 7-4-15, which applies to liquidated damages, and OCGA § 13-6-13, which applies to unliquidated damages in breach of contract cases, as bases for an award of prejudgment interest.[44] QTS moved for summary judgment on this issue, seeking a ruling that, as a matter of law, it cannot be held liable for prejudgment interest in this case. In denying QTS's request for summary judgment, the trial court did not address the statutory grounds at all — the court simply ruled that, except to the extent it granted summary judgment to QTS with respect to alleged damages in excess of $1 million, it "DENIE[D] summary judgment with respect to all other claims asserted."

On appeal, QTS urges us to agree with its characterization of the damages in this case as unliquidated and to conclude that prejudgment interest is therefore unavailable to InComm as a matter of law because prejudgment interest under OCGA § 7-4-15 can only be awarded on claims for liquidated damages. But as InComm argues in response, OCGA § 7-4-15 is not the only provision under which prejudgment interest can be awarded; prejudgment interest is also permitted under OCGA § 13-6-13, and that

---

[44] See *Braner v. Southern Trust Ins. Co.*, 255 Ga. 117, 119 (1) (335 SE2d 547) (1985).

statute applies to unliquidated damages.[45] And again, InComm identified both of these statutory bases before the trial court. Thus, even if we agree with QTS's assertion that this case involves only unliquidated damages, it does not follow that QTS was entitled to summary judgment on the issue of prejudgment interest.[46]

For the foregoing reasons, we agree with InComm that the trial court erred in denying its motion for summary judgment as to QTS's counterclaim for defamation based on a purported statement to SiriusXM, but we otherwise reject the parties' claims of error.

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Land, J., concur in judgment only.*

---

[45] See *Braner v. Southern Trust Ins. Co.*, 255 Ga. 117, 119 (1) (335 SE2d 547) (1985).

[46] QTS addresses the propriety of an award under OCGA § 13-6-13 in its reply brief, but we do not consider arguments raised for the first time in a supplemental brief. See *We Care Transp., Inc. v. BB&T Co.*, 335 Ga. App. 292, 296 (2) (780 SE2d 782) (2015) ("[W]e do not consider the arguments [Appellants] raised for the first time in their supplemental brief on the issue of the propriety of sanctions, because they failed to raise these arguments in their initial appellate brief.")).